**ROSEN & ASSOCIATES, P.C.**
*Counsel to the Debtor and Debtor
  in Possession*
747 Third Avenue
New York, NY 10017-2803
(212) 223-1100
Sanford P. Rosen
Paris Gyparakis

**UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>PRINCE FASHIONS, INC.,<br><br>                            Debtor. | Chapter 11<br><br>Case No. 19-23079 (RDD) |
| PRINCE FASHIONS, INC.,<br><br>                            Plaintiff.<br><br>v.<br><br>60G 542 BROADWAY OWNER, LLC, and 542 HOLDING CORP.,<br><br>                            Defendants. | Adv. Proc. No. __-_____ (RDD) |

## COMPLAINT FOR DECLARATORY RELIEF

Prince Fashions, Inc., the above-captioned debtor and debtor in possession (the "**Debtor**"), by its attorneys, Rosen & Associates, P.C., as and for its complaint (the "**Complaint**") against 60G 542 Broadway Owner, LLC ("**60G**") and 542 Holding Corp. ("**Holding Corp**." and collectively with 60G, the "**Defendants**"), respectfully represents as follows:

### JURISDICTION, VENUE & STATUTORY PREDICATE

1. The Court has jurisdiction over this adversary proceeding as a core proceeding pursuant to 28 U.S.C. §§ 157 and 1334. Venue is proper in this District pursuant to 28

U.S.C. §§ 1408 and 1409. The statutory predicate for the relief requested herein is 11 U.S.C. § 105, as supplemented by Rules 7001 and 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

2. The Debtor agrees to the entry of a final order or judgment by the Bankruptcy Court in this adversary proceeding.

## THE PARTIES

3. The Debtor is a corporation, duly organized under the laws of the state of New York in 1974.

4. The Debtor has occupied certain commercial property (the "**Premises**") located in a building situated at 542 Broadway, New York, New York 10012 (the "**Building**") since 1980, pursuant to a certain agreement of lease (the "**Lease**") by and between the Debtor,[1] as tenant, and Holding Corp., as landlord.

5. The Lease is for a term of 99 years and has two 50-year options to renew.

6. The extended term of the Lease runs for another 162 years.

7. Upon information and belief, Holding Corp. is a cooperative housing corporation, organized under the laws of the state of New York in or about 1990.

8. Upon information and belief, 60G is a limited liability company, authorized to conduct business in the state of New York.

## RELEVANT FACTS

**A. History of the Premises & Events Preceding the Sale**

9. In May of 2015, Holding Corp. converted the Premises to a retail condominium.

---
[1] As assignee of 542 Equity Associates

10. Upon information and belief, 60G is the owner of the retail condominium in which the Premises are located and is the assignee of Holding Corp.'s interest as landlord under the Lease.

11. The transfer to 60G was merely part of an overall scheme by the Defendants to deprive the Debtor of its Lease, evidenced by the terms of 60G's mortgage note, which requires 60G to evict the Debtor and re-let the Premises at market neutral terms.

12. After taking title to the Premises, 60G immediately embarked on a campaign to terminate the Debtor's tenancy and deprive the Debtor of its valuable property interest.

13. At all relevant times, the Building was indirectly owned and controlled by David Silverstein ("**Silverstein**").

14. Upon information and belief, Silverstein resided in a residential apartment in the Building until the early 1990's.

15. Upon information and belief, in or around 1979, Silverstein decided to convert the residential apartments in the Building to a cooperative and offered to sell the commercial unit to the Debtor.

16. On April 11, 1980, in furtherance of his effort to convert the residential apartments to cooperative units, Silverstein caused 542 Equities Associates ("**Equities Associates**") to convey the deed to the Building to Holding Corp.

17. At the time of the cooperative conversion, Silverstein was the principal of both Equities Associates and Holding Corp.

18. Upon information and belief, prior to April of 1980, Silverstein and the Debtor agreed to the terms of the sale of the Premises.

19. The agreement of Silverstein and the Debtor resulted in the execution and delivery of three agreements, all executed simultaneously on April 11, 1980:

(i) a "lease" agreement between Holding Corp., as "landlord" and Equities Associates as "tenant" (*i.e.*, the **Lease**);

(ii) an *Assignment of Lease*, whereby Equities Associates assigned to the Debtor all its interest in and to the Lease; and

(iii) a security agreement between Equities Associates and the Debtor, which memorialized the obligation of the Debtor to pay Equities Associates $40,000 (the "**Purchase Price**") in consideration of its interest in and to the Lease (the "**Security Agreement**," and together with the Lease and Assignment of Lease, the "**Prince Transfer Documents**," and generally, the "**Prince Transfer**").

20. The Prince Transfer Documents memorialized the transfer by Equities Associates to the Debtor of its interest in and to the Premises.

21. The Debtor subsequently paid the Purchase Price to Equities Associates in full.

22. Upon information and belief, the Purchase Price represented the fair-market value of a fee interest in and to the Premises at the time of the 1980 Prince Transfer.

23. Although denominated as a "lease," the Lease between Holding Corp. and Equities Associates was entered into for the sole purpose of facilitating the Prince Transfer.

24. Upon information and belief, the intent of the parties in consummating the Prince Transfer was for Silverstein to cause Equities Associates to sell the Premises to the Debtor.

**B. The Economic Terms of the Prince Transfer**

25. The "rent reserved" under the Lease is fixed throughout its term at 19.99% of the "net operating expenses of the building."

4

26. The rent under the Lease is calculated based upon the Debtor's allocated portion of the operating expenses and property taxes for the Building.

27. The rent reserved under the Lease is substantially below market rate.

28. No part of the rent payable under the Lease is attributable to the landlord's profit.

29. Upon information and belief, the economic features of the Lease, including its 199-year term and the obligation of the Debtor to pay only for its proportionate share of the expenses of the Building, provide the Debtor with the economic equivalent of ownership of the Premises.

**C. The Income Tax Treatment of the Prince Transfer**

30. Prior to 2007, in order to qualify as a "cooperative housing corporation" under section 216 of the Internal Revenue Code, no more than 20% of a corporation's yearly gross income could derive from operating a trade or business or from a commercial lease (the "**80/20 Rule**"). *See* 26 U.S.C. § 216.

31. Upon information and belief, because of the 80/20 Rule, the rent due under the Lease necessarily was limited to 19.99% of the corporation's gross income.

32. Upon information and belief, the only function of the rental structure under the Lease was to obtain tax-deductible benefits afforded by cooperative ownership and avoid recognition of capital gains inherent to a sale or exchange of the Premises.

33. In December 2007, the 80/20 Rule was repealed from the Internal Revenue Code to the extent that co-ops with substantial commercial income can now qualify for "cooperative housing corporation" status by satisfying one of two other tests. *See* Treas. Reg. §1.528-6.

### D. The Sham Mortgage & Alleged "Insurance Default"

34. In May of 2015, Holding Corp. purported to sell its interest in the commercial unit to 60G, which financed the purchase with the proceeds of a $12,900,000 secured loan from Meadow Partners LLC (the "**Mortgage**").

35. Upon information and belief, the Mortgage was part of an overall scheme to deprive the Debtor of its property rights, evidenced by the terms of the promissory note, which required 60G to evict the Debtor and re-let the Premises at market neutral terms.

36. Upon information and belief, the campaign to evict the Debtor based on an alleged "insurance default" was similarly motivated by Defendants' desire to reap a windfall by owning the Premises free and clear of the Debtor's proprietary interest.

## AS AND FOR COUNT I

37. The Debtor repeats and realleges each of the allegations set forth above with the same force and effect as if fully set forth at length herein.

38. The determination of whether a "lease" exists for purposes of section 365 of the Bankruptcy Code focuses on the economic substance of the agreement rather than its form or label.

39. The Lease is not the type of transaction that is entitled to the protections and priority in payment provided to landlords under section 365 of the Bankruptcy Code.

40. The Prince Transfer Documents memorialized the transfer by Equities Associates to the Debtor of its interest in and to the Premises

41. The Lease is not a true lease.

42. The economic substance of the Prince Transfer establishes that the parties intended the Lease to function, at most, as a proprietary lease in conjunction with a sale of the Premises.

43. The economic substance of the Prince Transfer as a whole, establishes that the parties intended the Prince Transfer to be a sale of the Premises to the Debtor.

**WHEREFORE**, the Debtor requests (a) the entry of an order declaring that (i) the Lease is not a true "lease" as that term is used in section 365 of the Bankruptcy Code, (ii) the Lease is not subject to the provisions of section 365 of the Bankruptcy Code; and (iii) the Prince Transfer Documents memorialized the transfer by Equities Associates to the Debtor of its interest in and to the Premises; and (b) granting the Debtor such other and further relief as the Court deems just and proper.

Dated: New York, New York
       November 22, 2019

**ROSEN & ASSOCIATES, P.C.**
*Counsel to the Debtor and Debtor*
  *in Possession*

By: */s/ Sanford P. Rosen*
     Sanford P. Rosen

747 Third Avenue
New York, NY 10017-2803
(212) 223-1100