## EXHIBIT A

**Proposed Amended Complaint**

**ROSEN & ASSOCIATES, P.C.**
*Counsel to the Debtor/Plaintiff*
747 Third Avenue
New York, NY 10017-2803
(212) 223-1100
Sanford P. Rosen
Paris Gyparakis

**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>PRINCE FASHIONS, INC.,<br><br>                     Debtor. | Chapter 11<br><br>Case No. 19-23079 (RDD) |
| PRINCE FASHIONS, INC.,<br><br>                     Plaintiff.<br><br>v.<br><br>60G 542 BROADWAY OWNER, LLC, and<br>542 HOLDING CORP.,<br><br>                     Defendants. | Adv. Proc. No. 19- 08714 (RDD) |

## AMENDED COMPLAINT FOR DECLARATORY RELIEF

Prince Fashions, Inc., the above-captioned debtor and debtor in possession (the "**Debtor**"), by its attorneys, Rosen & Associates, P.C., as and for its complaint (the "**Complaint**") against 60G 542 Broadway Owner, LLC ("**60G**") and 542 Holding Corp. ("**Holding Corp**." and collectively with 60G, the "**Defendants**"), respectfully represents as follows:

## JURISDICTION, VENUE & STATUTORY PREDICATE

1.    The Court has jurisdiction over this adversary proceeding as a core proceeding pursuant to 28 U.S.C. §§ 157 and 1334.

2. Venue is proper in this District pursuant to 28 U.S.C. §§ 1408 and 1409.

3. The statutory predicate for the relief requested herein is 11 U.S.C. § 105, as supplemented by Rules 7001 and 7008 of the Federal Rules of Bankruptcy Procedure (the "**Bankruptcy Rules**").

4. The Debtor agrees to the entry of a final order or judgment by the Bankruptcy Court in this adversary proceeding.

## THE PARTIES

5. The Debtor is a corporation, duly organized under the laws of the state of New York in 1974.

6. The Debtor has occupied certain commercial property, consisting of two retail store premises (the "**Premises**"), located in a building situated at 542 Broadway, New York, New York 10012 (the "**Building**") since 1980, pursuant to a certain agreement of lease (the "**Lease**") by and between the Debtor,[1] as tenant, and Holding Corp., as landlord.

7. The Lease is for a term of 99 years and has two 50-year options to renew, the extended term of the Lease runs for another 162 years.

8. Upon information and belief, Holding Corp. is a cooperative housing corporation, organized under the laws of the state of New York in or about 1980.

9. Upon information and belief, 60G is a limited liability company, authorized to conduct business in the state of New York.

## RELEVANT FACTS

A. **History of the Premises**

---

[1] As assignee of 542 Equity Associates.

10.    Upon information and belief, from June 5, 1974 through April 1980, the Building was owned indirectly by David Silverstein ("**Silverstein**") acting through 542 Equities, Inc. and 542 Equities Associates ("**542 Associates**").

11.    Upon information and belief, prior to April 1980, Silverstein was the sole principal of 542 Associates and had complete control of its affairs.

12.    Upon information and belief, Silverstein resided in a residential apartment in the Building until the early 1990's.

13.    Prior to April 1980, the Debtor was a commercial tenant of the Building.

14.    Upon information and belief, on April 11, 1979, Silverstein, acting in the capacity of sole principal of Holding Corp. caused Holding Corp. to enter into the Lease with 542 Associates.

15.    Upon information and belief, on April 11, 1979, Silverstein caused 542 Associates and Holding Corp. to enter into the Lease as part of his plan to either sell shares and proprietary lease related to the Premises or otherwise realize the value of the Premises through the sale of the Lease.

16.    Upon information and belief, prior to the conversion of the Building to a cooperative, Silverstein, acting in the capacity of sole principal of Holding Corp., offered to cause Holding Corp. to sell shares and proprietary lease with respect to the Premises to the Debtor.

17.    Upon information and belief, prior to the conversion of the Building to a cooperative, as an alternative to a sale of shares and proprietary lease in the Premises, Silverstein, acting in the capacity of cooperative sponsor, and sole principal of both 542 Associates and Holding Corp., offered to sell the Debtor a long term lease that would constitute an ownership interest in the Premises.

18.    Upon information and belief, the Debtor agreed to acquire the Premises through a series of transactions designed to achieve the sale to the Debtor of a long-term lease that would constitute an ownership interest in the Premises.

19.    Upon information and belief, prior to April of 1980, Silverstein and the Debtor agreed to the terms of the purchase and sale of the Premises through a series of transactions designed to sell the Premises through a sale of a long-term lease.

20.    On April 11, 1980, in furtherance of his effort to convert the Building to a cooperative, Silverstein caused 542 Associates to convey the deed to the Building to Holding Corp.

21.    Upon information and belief, Silverstein caused 542 Associates to convey the deed to the Building to Holding Corp. for no present consideration, except for the expectation that, as cooperative sponsor, he could thereby cause the sale of the units, including the Premises, in the cooperative.

22.    Upon information and belief, in or around April 1980, the residential portion of the Building became a cooperative.

23.    Upon information and belief, in or around April 1980, when the residential portion of Building became a cooperative, Silverstein was also the sole principal of, and controlled, Holding Corp.

24.    The agreement between Silverstein, as cooperative sponsor and sole principal of both 542 Associates and Holding Corp., and the Debtor resulted in the execution and delivery of three agreements:

> (i) a "lease" agreement between Holding Corp., as "landlord" and
> 542 Associates as "tenant" (i.e., the Lease), executed on April 11,
> 1979;

(ii) an *Assignment of Lease,* whereby 542 Associates assigned to the Debtor all its interest in and to the Lease, executed on April 22, 1980; and

(iii) a security agreement executed April 11, 1980, between 542 Associates and the Debtor, which memorialized the obligation of the Debtor to pay 542 Associates $40,000 (the "**Purchase Price**") in consideration of its interest in and to the Lease (the "**Security Agreement**," and together with the Lease and Assignment of Lease, the "**Prince Transfer Documents**," and generally, the "**Prince Transfer**").

25.     The Prince Transfer Documents memorialized the transfer of the Premises to the Debtor.

26.     The Prince Transfer Documents were duly recorded in the Office of the City Register of the City of New York, New York County on June 2, 1980.

27.     The Debtor subsequently paid the Purchase Price to 542 Associates in full.

28.     Upon information and belief, at the time of the Prince Transfer, Holding Corp. and 542 Associates were mere alter egos of one another, were both owned and controlled by Silverstein, and for all purposes relating to the Prince Transfer were in fact one and the same.

29.     Upon information and belief, at the time of the Prince Transfer, Holding Corp. and 542 Associates were not independent entities, but merely vehicles by which Silverstein, through Holding Corp., could convert the Building to a cooperative so as to realize the value of the residential portion through the purchases of shares, and to sell the commercial portion to the Debtor.

30.    Upon information and belief, in order to convert the Building to a cooperative and comply with the requirements of the Office of the New York Attorney General, as the Internal Revenue Code, Silverstein had to sell the commercial portion of the Building.

31.    Holding Corp., as alter ego of 542 Associates and owned and controlled by Silverstein, is bound to the Prince Transfer Documents.

32.    Upon information and belief, the property records indicate that that the Purchase Price represented the fair-market value of a fee interest in and to the Premises at the time of the Prince Transfer.

33.    Although denominated as a "lease," the Lease between Holding Corp. and 542 Associates was entered into for the sole purpose of facilitating the Prince Transfer by Holding Corp.

34.    Upon information and belief, Silverstein created 542 Associates to realize the value of the Premises through a sale of the Lease instead of the direct sale of the Premises.

35.    The intent of the parties in consummating the Prince Transfer was for Silverstein, as cooperative sponsor, and creator and sole principal of Holding Corp. to sell the Premises to the Debtor.

36.    In May of 2015, Holding Corp. converted the Premises to a retail condominium.

37.    Upon information and belief, 60G is the owner of the retail condominium in which the Premises are located and is the assignee of Holding Corp.'s interest as "landlord" under the Lease.

38.    The transfer to 60G was merely part of an overall scheme by the Defendants to deprive the Debtor of its ownership interest in the Premises, evidenced by the terms of 60G's

mortgage note, which requires 60G to evict the Debtor and re-let the Premises at market neutral

terms.

39.    After purporting to take title to the Premises, 60G immediately embarked

upon a campaign to terminate the Debtor's tenancy and deprive the Debtor of its valuable property

interest.

**B.  The Economic Terms of the Prince Transfer**

40.    By virtue of the Prince Transfer, Silverstein forfeited the right to profit from

the Premises.

41.    Upon information and belief, the Prince Transfer was intended to transfer

all property rights associated with the commercial portion of the Building to Prince, including the

right to profit from the Lease.

42.    Although denominated as "rent," the rent reserved was proportionate to and

represented the share of operating expenses ("**Maintenance**") attributed to the commercial portion

of the Building.

43.    No part of the rent payable under the Lease is attributable to Holding Corp's

profit.

44.    Holding Corp., as landlord under the Lease, derived no profit from the rent

generated by the Lease.

45.    The rent stated on the first page of the Lease provides, in relevant part:

> an annual rental of $7,076.46 for the first year, and 19.99%
> of the *net expenses of the building*, on an accrual basis, as
> defined in paragraph 43 for each subsequent year

*See* Exhibit A at 1 (emphasis added).

46.    Paragraph 42 of the Rider to Lease provides, in relevant part:

> The annual rental rate after the first year of the lease will be 19.99% of the net expenses, as *defined in paragraph 43D*, of the most recent calendar year for which an accounting of the Corporation's expenses has been delivered to the Tenant.

*See id.* ¶ 42 (emphasis added).

47.    Paragraph 43 of the Rider to Lease provides, in relevant part:

> A. The actual rent due after the first year of the lease will be 19.99% of the *Corporation's net expenses*, as defined in paragraph 43D, during the current calendar year….
>
> B.  In the event the rental rate exceeds the actual rent due, all monied paid to the Landlord in excess of the actual rent due *must be returned to the Tenant* within 30 days after receipt by the Tenant from the Landlord *of an accounting of said expenses*[.]
>
> *****
>
> D. Net expenses are accrued expenses related to the *operation of the building* for a calendar year, including depreciation of capital assets. Accrued expenses do not include expenditures during the year for goods and services benefiting other calendar years of expenditures for capital improvements. Capital improvements are those which have the effect of improving the physical structure of the building, but which are not considered repairs or maintenance. Capital Improvements shall be further defined according to the regulations of the Internal Revenue Service.

*See id.* ¶ 43 (emphasis added).

48.    Upon information and belief, the rental provisions of the Lease reinforce the requirement that the "Landlord" own the entire building.

49.    Upon information and belief, the economic features of the Lease, including its 199-year term and the obligation of the Debtor to pay only for its proportionate share of the cooperative's expenses, similar to maintenance payments, provide the Debtor with the economic equivalent of ownership of the Premises.

### C. The Tax Benefits of the Prince Transfer

Prior to 2007, in order to qualify as a "cooperative housing corporation" under section 216 of the Internal Revenue Code, at least 80% of the corporation's gross income must derive from "tenant-stockholders" and thus, no more than 20% of the corporation's gross income could derive from operating a trade or business or from a commercial lease (the "**80/20 Rule**"). *See* 26 U.S.C. § 216(b)(1)-(2).

50.    Upon information and belief, because of the 80/20 Rule, the rent due under the Lease necessarily was capped at 19.99% of the corporation's net operating expenses.

51.    Upon information and belief, because the cooperative corporation did not operate at a profit, its net operating expenses were equal to its gross income. *See* 26 U.S.C. § 216(b)(1)(C).

52.    By capping rent under the Lease at 19.99% of the cooperative corporation's net operating expenses, rent was capped at 19.99% of the cooperative gross revenue.

53.    Accordingly, the Lease was designed to satisfy the 80/20 Rule.

54.    Upon information and belief, the only purpose of the rental structure under the Lease was for Holding Corp. to maintain its tax status as a "cooperative housing corporation" for and allow its tenant-stockholders to deduct their proportionate share of real estate taxes and interest.

55.    The rental structure served to treat the Debtor as other shareholders in the cooperative - bound to pay a monthly maintenance predicated on its proportionate share of the operating expenses of the cooperative.

56.    Whereas the shareholders of the residential units own shares, the Debtor owns the Premises by virtue of its acquisition of the Lease.

57.    In December 2007, the 80/20 Rule was repealed from the Internal Revenue Code to the extent that co-ops with substantial commercial income can now qualify for "cooperative housing corporation" status by satisfying one of two other tests. *See* Treas. Reg. §1.528-6.

### D.  The Sham Mortgage & Alleged "Insurance Default"

58.    In May of 2015, Holding Corp. purported to sell its interest in the commercial unit to 60G, which financed the purchase with the proceeds of a $12,900,000 secured loan from Meadow Partners LLC (the "**Mortgage**").

59.    Upon information and belief, the Mortgage was part of an overall scheme to deprive the Debtor of its property rights, evidenced by the terms of the promissory note, which required 60G to evict the Debtor and re-let the Premises at market neutral terms.

60.    Upon information and belief, the campaign to evict the Debtor based on an alleged "insurance default" was similarly motivated by Defendants' desire to reap a windfall by "owning" the Premises free and clear of the Debtor's proprietary interest.

61.    Because the Premises were sold to the Debtor under the Prince Transfer Documents, to which Holding Corp. was bound, at the time Holding Corp. sold its purported interest in the premises to 60G, Holding Corp., in fact, had no interest in the Premises to sell because such interest resided in the Debtor.

62.    Subsequent to the purported sale of the Premises by Holding Corp to 60G, and the commencement by 60G of its scheme to deprive the Debtor of its property rights, 60G, in fact, had no legal right to prosecute its litigation to recover the Premises.

63.    Upon information and belief, 60G's campaign to evict the Debtor from the Premises was wrongful.

64.     Upon information and belief, at the time 60G prosecuted its litigation to evict the Debtor from the Premises, it had no legal right to do so.

## AS AND FOR COUNT I

65.     The Debtor repeats and realleges each of the allegations set forth above with the same force and effect as if fully set forth at length herein.

66.     The determination of whether a "lease" exists for purposes of section 365 of the Bankruptcy Code focuses on the economic substance of the agreement rather than its form or label.

67.     The Lease is not the type of transaction that is entitled to the protections and priority in payment provided to landlords under section 365 of the Bankruptcy Code.

68.     The Prince Transfer Documents memorialized the transfer, which was binding upon Holding Corp., of an ownership interest in and to the Premises.

69.     The Lease is not a true lease.

70.     The economic substance of the Prince Transfer establishes that the parties intended the Lease to function, at most, as a proprietary lease in conjunction with a sale of the Premises.

71.     The economic substance of the Prince Transfer as a whole, establishes that the parties intended the Prince Transfer to be a sale of the Premises to the Debtor.

## AS AND FOR COUNT II

72.     60G's prosecution of its litigation to evict the Debtor from the Premises was wrongful.

73.     As a result of 60G's wrongful actions, the Debtor has been denied its right, title, and interest in and to the Premises.

74. Therefore, the Debtor is entitled to a judgment against 60G in an amount

to be determined at a trial of this adversary proceeding.

**WHEREFORE**, the Debtor requests the entry of an order and judgment (a)

declaring that (i) the Lease is not a true "lease" as that term is used in section 365 of the Bankruptcy

Code, (ii) the Lease is not subject to the provisions of section 365 of the Bankruptcy Code; and

(iii) the Prince Transfer Documents memorialized the transfer by Holding Corp. to the Debtor of

its interest in and to the Premises; and (iv) the Debtor is the owner of the Premises; (b) for damages

against 60G, in an amount to be determined at a trial of this adversary proceeding ; and (c) granting

the Debtor such other and further relief as the Court deems just and proper.

Dated:  New York, New York
            August 28, 2020

                                                                    **ROSEN & ASSOCIATES, P.C.**
                                                                    *Counsel to the Debtor/Plaintiff*

                                                                    By:  */s/ Sanford P. Rosen*
                                                                            Sanford P. Rosen

                                                                    747 Third Avenue
                                                                    New York, NY 10017-2803
                                                                    (212) 223-1100