**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| In re:<br><br>PRINCE FASHIONS, INC.,<br><br>                              Debtor. | Chapter 11<br><br>Case No. 19–23079 (RDD) |
| PRINCE FASHIONS, INC.,<br><br>                              Plaintiff,<br><br>v.<br><br>60G 542 BROADWAY OWNER, LLC and<br>542 HOLDING CORP.,<br><br>                              Defendants. | Adv. Proc. No. 19–08714 (RDD) |

---

## DEBTOR'S AMENDED AND RESTATED RESPONSE
## IN OPPOSITION TO DEFENDANTS' MOTIONS TO DISMISS

---

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ........................................................................................................ ii

RELEVANT FACTUAL & PROCEDURAL BACKGROUND .................................................. 1

ARGUMENT .............................................................................................................................. 1

I.  THE BANKRUPTCY COURT HAS EXCLUSIVE SUBJECT MATTER JURISDICTION
    OVER THIS ADVERSARY PROCEEDING ...................................................................... 6

    A.  The Decision Constitutes the Law of the Case ........................................................ 8
    B.  The Complaint Does Not Assert a "Wrongful Eviction" Claim ............................. 10
    C.  The Complaint Need Not Assert Any Remedy at this Juncture ............................. 11

II. 60G'S PURPORTED OWNERSHIP OF THE PREMISES HAS BEEN AND
    CONTINUESTO BE CONTESTED AND NEITHER THE CIVIL COURT NOR ANY
    OTHER COURT HAS EVER MADE A DETERMINATION AS TO OWNERSHIP OF
    THE PREMISES ........................................................................................................... 11

III. 60G WAS ON CONSTRUCTIVE NOTICE OF THE PRINCE TRANSFER WHEN
     IT ACQUIRED THE PREMISES SUBJECT TO THE TERMS OF THE LEASE ............. 12

IV. THE DEBTOR HAD THE RIGHT TO ASSERT THE CLAIMS HEREIN AS OF
    THEPETITION DATE .................................................................................................. 16

    A.  The Complaint Does Not Seek to Revive the Lease .............................................. 16
    B.  60G's Argument that the Court Cannot Consider the Relief Requested Herein Because the
        Lease May Have Been Terminated Pre-Petition Is Entirely Fact-Bound and Meritless ......... 17

V.  THE DEBTOR HAS ADEQUATELY PLEADED THE CLAIMS HEREIN .................... 18

    A.  Standard of Review .............................................................................................. 18
    B.  The Economic Realities Test ................................................................................ 19

        i.    The Prince Transfer Documents Impose No True Rent Obligations ........................... 20
        ii.   The Length of the Lease ....................................................................................... 22
        iii.  The Underlying Tax Motives ................................................................................. 23
        iv.   Whether the Lease Was Part of a Larger Agreement .................................................. 26

CONCLUSION ......................................................................................................................... 26

i

# TABLE OF AUTHORITIES

## Cases

*1426 46 St., LLC v. Klein,* 60 A.D.3d 740, 743, 876 N.Y.S.2d 425 (2009) ...............................15

*Ashcroft v. Iqbal,* 556 U.S. 662 (2009) ..........................................................................................18

*Bold Electric, Inc. v. City of New York,* 53 F.3d 465 (2d Cir. 1995) .......................................19

*City Bank of Bayonne v. Hocke,* 168 A.D. 83 N.Y.S. 731 ..........................................................15

*Drake v. Cunningham,* 127 A.D., 79, 111 N.Y.S. 199 (2d Dep't 1908) ..................................11

*Exxon Mobil Corp. v. Saudi Basic Indus. Corp.,* 544 U.S. 280 (2005).......................................6

*Galtieri v. New York City Police Pension Fund,* 2014 U.S. Dist. LEXIS 129665
     (S.D.N.Y. Sept. 15, 2014) ........................................................................................................11

*Harris v. Mills,* 572 F.3d 66 (2d Cir. 2009) ....................................................................................18

*Hense v. Martin,* 417 F. App'x 83 (2d Cir. 2011) ..........................................................................7

*In re Best Products Co., Inc.,* 157 B.R. 222 (Bankr.S.D.N.Y.1993) ..........................................19

*In re Chateaugay Corp.,* 102 B.R. 335(Bankr. S.D.N.Y. 1989) .................................................13

*In re Emory Properties, Ltd.,* 106 B.R. 318 (Bankr.N.D.Ga.1989) ...........................................23

*In re Hardway Restaurant, Inc.,* 31 B.R. 322 (Bankr. S.D.N.Y. 1983) .....................................15

*In re Hotel Syracuse, Inc.,* 155 B.R. 824 (Bankr. N.D.N.Y. 1993) ..............................8, 12, 20

*In re Lefrak,* 223 B.R. 431 (Bankr. S.D.N.Y. 1998) ...............................................20, 21, 24, 26

*In re Moreggia Sons, Inc.,* 852 F.2d 1179 (9th Cir. 1988) ..........................................................13

*In re PCH Assocs.,* 55 B.R. 273 (Bankr. S.D.N.Y. 1985)...........................................................13

*In re PCH Assocs.,* 804 F.2d 193 (2d Cir. 1986) ..........................................................11, 12, 19, 22

*In re PCH Assocs.,* 949 F.2d 585 (2d Cir. 1991) ...........................................................................11

*In re Robertson,* 147 B.R. 358 (Bankr.D.N.J.1992)......................................................................22

*In re Ward,* 423 B.R. 22 (Bankr. E.D.N.Y. 2010) ..........................................................................7

*International Trade Admin. v. Rensselaer Polytechnic Inst.,* 936 F.2d 744 (2d Cir.1991) ..........19, 23

*Maiorano v Garson,* 65 AD3d 1300, 1303, 886 NYS2d 190 (2009)..........................................16

*Mashie v. Dooley,* 48 Misc. 2d 1098, 266 N.Y.S. 2d 661 (Sup. 1965) .....................................11

*Phifer v. City of New York,* No. 01-7131, 2002 U.S. App. LEXIS 7340
     (2d Cir. Apr. 19, 2002) ............................................................................................................10

*Porter v. Newton,* 141 Misc. 760, 253 N.Y.S. 200 (Sup. 1931)..................................................11

*Reed v. Garden City Union Free School Dist.,* 987 F. Supp. 2d 260 (E.D.N.Y. 2013)...............19

*Stracham v Bresnick,* 76 A.D.3d 1009; 908 N.Y.S.2d 95; 2010 N.Y. App. Div. LEXIS 6767 (2010) .....15

*Walker v. Schult,* 717 F.3d 119, 124 (2d Cir. 2013) ....................................................................19

## Statutes

26 U.S.C. § 216;..............................................................................................................................23

RPAPL § 711 ....................................................................................................................................11

## Academic Authorities

*Cotter & Co. v. United States: The Federal Circuit Finds the Meaning of Subchapter To be Less Than Cooperative*, 47 OHIO STATE L.J. 565, 568-569 (1986). .........................................................................................25

Dale A. Whitman, *Financing Condominiums and Cooperatives,* 13 TULSA L.J. 15 (1977-1978) ....................23

Ezra Dyckman & Seth A. Hagen, *Congress Cooperates with Co-Ops,* N.Y.L.J., February 27, 2008...........24

Marshall E. Tracht, *Leasehold Recharacterization in Bankruptcy: A Review and Critique* (N.Y. LAW SCH. LEGAL STUD. RES. Paper No. 12/ 13 #42) p. 24, n. 118 (2013) ........................................................20

Philip N. Smith, *A Survey of The Legal Aspects of Cooperative Apartment Ownership,* 16 U. MIAMI L. REV. 305, 313 (1961). .......................................................................................................................................25

## Treatises

1 Rasch, N.Y. LANDLORD AND TENANT, § 2:5 [4th ed.]...........................................................................16

## Revenue Rulings

REV. RUL. 68-387; 1968-2 C.B. 112....................................................................................................23

REV. RUL. 75-547, 1975-2 C.B. 89......................................................................................................24

Prince Fashions, Inc., the above-captioned debtor and plaintiff herein (the "**Debtor**"), through its counsel, Rosen & Associates, P.C., submits this consolidated response (the "**Response**") in opposition to the *Motion to Dismiss Plaintiff's Amended Complaint Pursuant to Fed. R. Civ. P. 12(b)(6)* [Adv. Proc. Doc. Nos. 41-42] (the "**Renewed Motion to Dismiss**") filed by defendant 60G 542 Broadway Owner, LLC ("**60G**"), and the joinder (the "**Joinder**") to the Renewed Motion to Dismiss [Adv. Proc. Doc. No. 44] filed by defendant 542 Holding Corp. ("**Holding Corp.**" and collectively with 60G, "**Defendants**"). In support of this Response, the Debtor submits the accompanying affidavit of Bruce H. Wiener (the "**Wiener Affidavit**"),[1] a partner of Warshaw Burstein, LLP and counsel to the Debtor in the prior state court proceedings, and respectfully represents as follows:

## RELEVANT FACTUAL & PROCEDURAL BACKGROUND

1.    The Debtor formerly occupied a parcel of commercial property (the "**Premises**") at 542 Broadway, New York, New York 10012 (the "**Building**") since 1980, pursuant to a 99-year lease—with two 50-year options to renew (the "**Lease**")—by and between the Debtor,[2] as tenant, and Holding Corp., as landlord.

2.    From June 5, 1974 through April 1980, the Building was owned indirectly by David Silverstein ("**Silverstein**") acting through Holding Corp. and 542 Equities Associates ("**542 Associates**"). *See* AMD. COMPL. ¶ 10.

3.    On April 11, 1980, in furtherance of his effort to convert the Building to a cooperative, Silverstein caused 542 Associates to convey the deed to the Building to Holding Corp. for no present consideration, except for the expectation that, as cooperative sponsor, he could

---

[1] Annexed hereto as *Exhibit 1*.
[2] As assignee of 542 Equity Associates.

thereby cause the sale of the units, including the Premises, in the cooperative. *See* AMD. COMPL. ¶¶ 14-15 & 19-22.

4.     Indeed, Holding Corp. and 542 Associates were but merely vehicles by which Silverstein, through Holding Corp., could convert the Building to a cooperative so as to realize the value of the residential portion through the purchases of shares, and either maintain the commercial portion for himself or sell it to the Debtor. *See* AMD. COMPL. ¶¶ 15-17 & 28-29.

5.     In May of 2015, Holding Corp. purported to sell its interest in the Premises to 60G, which financed the purchase with the proceeds of a $12,900,000 mortgage loan from Meadow Partners LLC (the "**Mortgage**").

6.     The Mortgage was part of an overall scheme of the mortgagee and 60G to deprive the Debtor of its property rights, evidenced by the terms of the promissory note itself, which required 60G to evict the Debtor and re-let the Premises at *market neutral terms*. *See* WIENER AFF., Ex. A (*The Verified Foreclosure Complaint*) 28 & 47 ("[60G] hereby covenants to … diligently prosecute the amendment, modification, or termination of the Retail Master Lease … resulting in the utilization of the Premises on arms-length, market rental terms").

7.     After taking title to the Premises, 60G embarked on a campaign to evict the Debtor, in a blatant attempt to reap a windfall and deprive the Debtor of its proprietary interest.

8.     To this end, 60G issued a series of default notices starting in March of 2016, alleging, *inter alia*, that the Debtor had breached its obligation under the Lease to name 60G as an additional insured under its commercial general liability policy, which spawned a litany of litigation in various state court proceedings (collectively, the "**State Court Proceedings**").[3]

---

[3] The Debtor incorporates by reference the *Debtor's Response to the Motion to Dismiss* [Doc. No.12] ¶¶ 11-23 and the *Declaration of Doron Zabari Pursuant to Rule 1007-2* [Doc. No. 10] *Schedule 1*, for a more detailed account of the factual and procedural background of the State Court Proceedings.

9.    Subsequently, the Debtor timely commenced an action in the New York Supreme Court, County of New York (the "**Supreme Court**"), styled*, Prince Fashions, Inc. v. 60G 542 Broadway Owner, LLC*, Index No. 651255/16 (N.Y. Sup. Ct. 2018), seeking a *Yellowstone* injunction, in order to maintain the *status quo* pending resolution of the underlying merits (the "***Yellowstone* Action**").

10.    Ultimately on appeal, the Appellate Division of the New York Supreme Court, First Department, affirmed denial of the Debtor's request for a *Yellowstone* injunction on the insurance issue (the "**Appellate Division Order**"). *See* WIENER AFF., EX. B (*Appellate Division Order*) (*Prince Fashions, Inc. v. 60G 542 Broadway Owner, LLC*, 149 A.D.3d 529, 53 N.Y.S.3d 24 (1st Dept. 2017)).

11.    60G then commenced a summary holdover proceeding in the Civil Court of the City of New York (the "**Civil Court**"), styled, *60G 542 Broadway Owner, LLC v. Prince Fashions, Inc., et al.*, L&T Index No. 69380/2016 (N.Y.C. Civ. Ct. 2016) (the "**Holdover Proceeding**"), seeking to terminate the Lease based upon the alleged breach of the insurance provision, pursuant to a conditional limitation clause.

12.    Although the Civil Court initially granted 60G's motion for a judgment of possession (the "**Summary Judgment Order**"), upon renewal, the Civil Court granted the Debtor's motion for reargument and renewal from the Summary Judgment Order (the "**Renewal Order**"), based in part upon 60G's documented withholding of critical facts from the court, as well as previously unavailable evidence introduced by the Debtor that raised triable issues with respect to the Debtor's untried defenses. *See id.*, Ex.'s C & D (*Summary Judgment Order* and *Renewal Order*, respectively).

13.     On 60G's appeal of the Renewal Order to the Appellate Term, First Department, the court reversed the Renewal Order and granted 60G a judgment of possession with the warrant to issue forthwith (the "**Appellate Term Order**"). However, the Appellate Term Order emphasized that the Appellate Division Order denying *Yellowstone* relief, "was not an adjudication of the merits of the validity of landlord's termination of the lease and did not constitute law of the case." *See id.,* Ex. E (*Appellate Term Order*).

14.     Confronted with the imminent risk of losing its only asset and sole source of revenue, the Debtor petitioned this Court for relief under chapter 11 of title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "**Bankruptcy Code**") on May 29, 2019 (the "**Petition Date**").

15.     On November 22, 2019, the Debtor commenced this adversary proceeding by filing a complaint [Adv. Proc. Doc. No. 1] (the "**Complaint**") against the Defendants seeking, *inter alia*, a declaratory judgment that the Lease, though terminated, is among the underlying documents of a transaction (the "**Prince Transfer Documents**," as defined in the Complaint) which memorialized a transfer of ownership rights to the Premises (the "**Prince Transfer**," as defined in the Complaint). *See* COMPL. ¶¶ 19-24.

16.     On January 17, 2020, 60G moved to dismiss the Complaint [Adv. Proc. Doc. No. 7] (the "**First Motion to Dismiss**") pursuant to Rules 12(b)(1) and (6) of the Federal Rules of Civil Procedure (the "**Federal Rules**" or "**Rules**") asserting that the claims herein were barred under various legal theories—including the *Rooker-Feldman* doctrine, *res judicata*, collateral estoppel and judicial estoppel—and for failure to state a claim upon which relief can be granted.

17.     On February 11, 2020, the Debtor filed its *Response in Opposition to Defendant's Motion to Dismiss* [Adv. Proc. Doc. No. 15] (the "**First Response**"), and after convening a hearing (the "**Hearing**") on July 14, 2020, the Court entered an *Order on Motion to Dismiss Adversary Complaint* on July 15, 2020 [Adv. Proc. Doc. No. 23] (the "**Dismissal Order**"[4] and together with the record of the Hearing, the "**Decision**") denying the First Motion to Dismiss, "in all respects, except in respect of the traditional 12(b)(6) relief sought [for] failure to state a claim under *Twombly* and *Iqbal*." *See Hearing Transcript*[5] (hereinafter, "**Hrg. Tr.**") 46:3-5.

18.     On September 3, 2020, the Debtor filed a *Motion For Leave to Amend the Complaint for Declaratory Relief* (the "**Motion to Amend**") [Adv. Proc. Doc. No. 26] pursuant to Rule 15, applicable herein pursuant to Bankruptcy Rule 7015. *See generally* MOT. TO AMD. [Adv. Proc. Doc. No. 26].

19.     Notably, 60G did not oppose the Motion to Amend on the grounds of futility, but rather "reserve[d] all [of its] rights with respect to the amended adversary complaint." *See 60G's Response to Motion to Amend* [Adv. Proc. Doc. No. 31]. Holding Corp. did not respond to the Motion to Amend but filed an answer (the "**Amended Answer**") to the Amended Complaint on December 10, 2020 [Adv. Proc. Doc. No. 37].[6]

20.     On January 11, 2021, 60G filed the Renewed Motion to Dismiss, asserting many of the same arguments advanced in the First Motion to Dismiss, in which the Court—in a

---

[4] As corrected on July 24, 2020 [Adv. Proc. Doc. No. 24].

[5] A copy of which is annexed hereto as *Exhibit 2*.

[6] Thus, Holding Corp.'s Joinder, filed after its Amended Answer but before the pleadings had closed, is both untimely as a Rule 12(b)(6) motion and premature as a Rule 12(c) motion for judgment on the pleadings. *See F.R.C. Int'l, Inc. v. United States,* 278 F.3d 641, 642 (6th Cir. 2002) (judgment on the pleadings under Fed.R.Civ.P. 12(c) unavailable because the other defendant had not filed an answer and thus the pleadings were not closed as required by the rule).

comprehensive fifty-page Decision after extensive briefing—***expressly rejected*** in accordance with long-standing judicial principles and binding Second Circuit authority.

21.     For the reasons discussed below, both the Joinder[7] and 60G's Renewed Motion to Dismiss should be denied.

## ARGUMENT

## I.     THE BANKRUPTCY COURT HAS EXCLUSIVE SUBJECT MATTER JURISDICTION OVER THIS ADVERSARY PROCEEDING

22.     The *Rooker-Feldman* doctrine is rooted in the statutory dictate that lower federal courts, as courts of original, not appellate, jurisdiction, are prohibited from reviewing state court rulings in certain circumstances. *See Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 292 (2005).

23.     However, *Rooker-Feldman* is considered a "narrow" doctrine, limited to "cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the [federal] court proceedings commenced and inviting [federal] court review and rejection of those judgments." *See Nat'l Med. Imaging, LLC v. U.S. Bank (In re Nat'l Med. Imaging, LLC)*, 20-12618 (ELF) 16 (Bankr. E.D. Pa. Feb. 22, 2021) (*citing Exxon Mobil,* 544 U.S. at 284).

---

[7] The Debtor respectfully submits that the *Affidavit of Maryellen Goble in Support* of the Joinder [Adv. Proc. Doc. No. 44-7] (the "**Goble Affidavit**") should be excluded from consideration, as constituting material outside of the pleadings. *See Newman & Schwartz v. Asplundh Tree Expert Co.*, 102 F.3d 660, 662 (2d Cir.1996) (affirmations or attachments to affirmations that are not part of the challenged pleading may not be considered for purposes of a motion to dismiss for failure to state a claim). Should the Court decide to treat the Joinder as a motion for summary judgment, the Goble Affidavit should be stricken from the record as inadmissible. *See Bumgarner v. Joe Brown Co.*, 376 F.2d 749 (10th Cir. 1967) (an attorney's affidavit, expressing his belief that the facts set forth in defendant's affidavit were not true, and also stating his inability, from lack of knowledge, to set forth counter-allegations of fact is inadmissible under Rule 56).

24.     Under Second Circuit authority, there are four requirements for the application of *Rooker–Feldman:* (i) the federal-court plaintiff must have lost in state court; (ii) the plaintiff must "complain[ ] of injuries caused by [a] state-court judgment;" (iii) the plaintiff must "invit[e] district court review and rejection of [that] judgment;" and (iv) the state-court judgment must have been "rendered before the district court proceedings commenced." *See Hense v. Martin*, 417 F. App'x 83, 83–84 (2d Cir. 2011) (*citing McKithen v. Brown*, 481 F.3d 89, 97 (2d Cir.2007); *Hoblock v. Albany County Bd. of Elections,* 422 F.3d 77, 85 (2d Cir.2005)).

25.     The *Rooker–Feldman* doctrine ***does not*** divest the federal court of jurisdiction of an "independent claim based on an injury not 'caused by' the state-court judgment, even if the claim denies a legal conclusion of the state court." *See In re Ward*, 423 B.R. 22, 27 (Bankr. E.D.N.Y. 2010) (citing *Estate of Keys v. Union Planters Bank, N.A.*, 578 F.Supp.2d 629, 637 (S.D.N.Y.2008)).

26.     60G claims that the Debtor, "effectively seeks to relitigate and collaterally attack the finding of the State Court, [but that] in light of the *Rooker-Feldman* doctrine … Count I of the Amended Complaint seeking to recharacterize the Lease into a document conveying the Premises to Prince must be dismissed for lack of subject matter jurisdiction." *See* Renewed Mot. to Dis. at 11-12.

27.     However, in its Decision, this Court specifically held that, "[a]s far as *Rooker-Feldman* is concerned, the present action is ***not looking*** effectively to undo the determination of the state courts [because] the Debtor here is not looking to obtain and will not be enabled to obtain possession of the property," and that, "while a defense to the civil court eviction action, that was ultimately affirmed by the Appellate Division, can include matters that would be outside of the civil court's jurisdiction as affirmative claims, if they're raised as a defense … the

cause of action here … does not assert a defense to possession of the property." *See* HRG. TR. 29:21-25 & 40:3-12 (emphasis added).

28.     The Decision further held that, "[c]ourts in the Second Circuit have … consistently held that the issue of recharacterization, when brought in a bankruptcy case, is to be decided as a matter of federal law, not applicable state law," and that, "the court's jurisdiction [arises] under 28 U.S.C. Section [sic] 1334(e), which grants the district courts, and through the general order of reference and 28 U.S.C. Section [sic] 157(a) devolves to the Bankruptcy Court's exclusive jurisdiction over all property of the Debtor and the estate for purposes of determining issues as to the property of the estate." *See* HRG. TR. 30:7-9 & 18-25 & 30:1-15.

29.     Accordingly, the Court concluded, "that the *Rooker-Feldman* doctrine ***could not*** apply here because the issue before me is a matter of federal law that the state court ***could not*** have decided." *See* HRG. TR. 32:22-25 & 33:1-6 (*citing In re Haven Eldercare*, LLC, 503 F. App'x 13, n. 1 (2d Cir. 2012); *In re Hotel Syracuse, Inc.,* 155 B.R. 824, 832 (Bankr. N.D.N.Y. 1993) (emphasis added)).

30.     The Court's prior rejection of 60G's argument that the Amended Complaint should be dismissed pursuant to the *Rooker-Feldman* doctrine is applicable to the same argument 60G repeats now. The argument should also be rejected because the Court's conclusion on this issue constitutes the law of the case.

### A.     The Decision Constitutes the Law of the Case

31.     The law of the case doctrine "posits that when a court decides upon a rule of law, that decision should continue to govern the same issues in subsequent stages in the same case" unless "cogent and compelling reasons militate otherwise." *Johnson v. Holder,* 564 F.3d 95, 99 (2d Cir. 2009) (*quoting U.S. v. Quintieri,* 306 F.3d 1217, 1226 (2d Cir. 2002); *Christianson v.*

*Colt Indus. Operating Corp.*, 486 U.S. 800, 816, 108 S.Ct. 2166, 2177, 100 L.Ed.2d 811 (1988)); *see also* 1B James W. Moore, Jo D. Lucas & Thomas S. Currier, MOORE'S FEDERAL PRACTICE ¶ 0.404[1], at 117 (1991) ("Under the doctrine of law of the case, a decision on an issue of law made at one stage of a case becomes a binding precedent to be followed in successive stages of the same litigation.").

32.     Cogent and compelling reasons to revisit an earlier decision are generally found only where there is "an intervening change of controlling law, the availability of new evidence, or the need to correct a clear error or prevent a manifest injustice." *Official Comm. of Unsecured Creditors of Color Tile, Inc. v. Coopers & Lybrand LLP, 322 F.3d 147, 167* (2d Cir., 2003) (*quoting Virgin Atl. Airways Ltd. v. Nat'l Mediation Bd.,* 956 F.2d 1245, 1255 (2d Cir.1992)); *see also Bergerson v. N.Y. State Office of Mental Health*, 652 F.3d 277, 288 (2d Cir.2011) ("where litigants have once battled for the court's decision, they should neither be required, nor without good reason permitted, to battle for it again") (*quoting Zdanok v. Glidden Co.*, 327 F.2d 944, 953 (2d Cir. 1964)).

33.     Unlike the kindered rule of *res judicata*, the law of the case doctrine "does not involve preclusion by final judgment; instead, [it] regulate[s] judicial affairs before final judgment." *In re HS 45 John LLC*, 585 B.R. 64, 80 (Bankr. S.D.N.Y. 2018) (citing *In re PCH Assocs.*, 949 F.2d 585, 592 (2d Cir. 1991); *In re Motors Liquidation Co.,* 576 B.R. 313, 321 (Bankr. S.D.N.Y. 2017) ("Where res judicata bars parties in subsequent actions from relitigating what has already been decided, law of the case holds that a court should adhere to its earlier decisions in subsequent stages of litigation.").

34.     60G doesn't even attempt to craft a cogent and compelling reason to revisit its *Res Judicata* argument, and indeed, none exist. The Court should not reconsider its arguments

at this juncture. *See Nobel Ins. Co. v. City of New York, No. 00-CV-1328* (KMK), 2006 WL 2848121, at *4 (S.D.N.Y. Sept. 29, 2006) (refusing to reconsider "legal conclusions" made when deciding a motion to dismiss "which are not in any way altered by discovery, or by subsequent developments in the law" in connection with a subsequent motion for summary judgment); *see also Viti v. Guardian Life Ins. Co. of Am.*, No. 10-CV-2908 (ALC), 2013 WL 6500515, at *3-4 (S.D.N.Y. 2013); *In re New Bern Riverfront Dev., LLC*, 516 B.R. 316 (Bankr. E.D.N.C. 2014) (applying law of the case within the same adversary proceeding).

## B.    The Complaint Does Not Assert a "Wrongful Eviction" Claim

35.    60G claims that this Court lacks jurisdiction over Count Two of the Complaint, which states that: "60G's prosecution of its litigation to evict the Debtor was wrongful," and that the Debtor is "entitled to a judgment against 60G in an amount to be determined at a trial," because it seeks review of the Appellate Term Order and is a "direct attack on the judgment of possession and related orders entered by the State court." *See* RENEWED MOT. TO DIS. at 12.

36.    The Debtor however does not assert an "unlawful eviction" claim in this proceeding, as that term is used under sections 713(10) and 768 of New York's Real Property Actions and Proceedings Law.

37.    Moreover, 60G fails to provide any analysis of how these claims are inextricably intertwined with the judgment of possession, or how it otherwise amounts to a "de facto" appeal, as required under the *Rooker-Feldman* doctrine. *See Phifer v. City of New York,* No. 01-7131, 2002 U.S. App. LEXIS 7340, at *12-13 (2d Cir. Apr. 19, 2002) ("With regard to what claims are "inextricably intertwined," the Second Circuit has stated that "where the claims were never presented in the state court proceedings and the plaintiff did not have an opportunity to

present the claims in those proceedings, the claims are not inextricably intertwined and therefore not barred by *Rooker-Feldman*."); *Galtieri v. New York City Police Pension Fund*, 2014 U.S. Dist. LEXIS 129665, at *27 n.11 (S.D.N.Y. Sept. 15, 2014) ("Rooker-Feldman applies when the state proceeding has ended with respect to the issues that the federal plaintiff seeks to have reviewed in federal court, even if other matters remain to be litigated.").

### C. The Complaint Need Not Assert Any Remedy at this Juncture

38. In fact, as this Court has already noted, under *In re PCH Assocs.*, 804 F.2d 193 (2d Cir. 1986) ("PCH-1") and *In re PCH Assocs.*, 949 F.2d 585 (2d Cir. 1991) ("PCH-2"), "the question of the proper remedy, other than possession[,] is one to be decided … after the declaration … is ever obtained that the transaction is really one involving the transfer of ownership, as opposed to leasehold interest." *See* HRG. TR. 33:19-34; *In re PCH Assocs.*, 949 F.2d 585 (2d Cir. 1991) (PCH-1 "did not conclusively establish the nature of the relationship between PCH and Liona).

### II. 60G'S PURPORTED OWNERSHIP OF THE PREMISES HAS BEEN AND CONTINUES TO BE CONTESTED AND NEITHER THE CIVIL COURT NOR ANY OTHER COURT HAS EVER MADE A DETERMINATION AS TO OWNERSHIP OF THE PREMISES

39. 60G's repeated assertion that the Appellate Term "specifically recognized 60G as the owner of the retail condominium unit" and that this finding is "binding on this Court" —as previously discussed and briefed at length—fails as a matter of law because the Appellate Term, in reviewing a finding made in a summary eviction proceeding, "does not have jurisdiction to determine issues that do not fall within the scope of the proceeding." *Drake v. Cunningham,* 127 A.D., 79, 111 N.Y.S. 199 (2d Dep't 1908); *Porter v. Newton,* 141 Misc. 760, 253 N.Y.S. 200 (Sup. 1931); *Mashie v. Dooley*, 48 Misc. 2d 1098, 266 N.Y.S. 2d 661 (Sup. 1965); *see generally* RPAPL § 711 (McKinney 1985) (the subject matter jurisdiction of the court in a summary

proceeding is strictly limited to "recover possession of real property located in whole or in part within the municipality, to remove tenants therefrom, and to render judgment for rent due without regard to amount").

40.     Moreover, although 60G's represents that the State Court "conclusively determined that 60G is the owner of the Premises and this Court lacks jurisdiction" to hold otherwise" (RENEWED MOT. TO DIS. p. 4), in fact, no such determination was made by the Civil Court or any other court.

41.     60G's attempt to transform the Civil Court's mere reference to the pleadings into a finding of fact is inappropriate.

### III.     60G WAS ON CONSTRUCTIVE NOTICE OF THE PRINCE TRANSFER WHEN IT ACQUIRED THE PREMISES SUBJECT TO THE TERMS OF THE LEASE

42.     60G asserts that it was a bona fide purchaser of real property which acquired title without notice of Debtor's "undocumented, undisclosed and disguised sale arrangement" and thus is not bound by it. *See* RENEWED MOT. TO DIS. at 13.

43.     As an initial matter, the premise of 60G's argument is inherently inconsistent with the entire body of caselaw on this subject.

44.     As the court held in *In re Hotel Syracuse, Inc.*, "[a]t the heart of the instant adversary proceeding is the issue of whether Code § 365(d)(4) applies to the Lease [and] the proper focus in determining [this] is "whether the parties intended to impose obligations and confer rights significantly different from those arising from the ordinary landlord/tenant relationship." (*citing International Trade Admin. v. Rensselaer Polytechnic Inst.,* 936 F.2d 744, 748 (2d Cir.1991); *In re PCH Associates,* 804 F.2d at 200.

45.     "In making this determination a court is not constrained by the labels placed upon the transaction by the parties. Rather, the court must look to the economic substance of the transaction to determine whether it is in fact a 'true' lease. *Id.* (*citing See Rensselaer Polytechnic Institute,* 936 F.2d at 748; *In re PCH Associates,* 804 F.2d at 200); *In re Moreggia Sons, Inc.*, 852 F.2d 1179 (9th Cir. 1988).

46.     In support of its claim that it had no knowledge of the Prince Transfer, 60G cites § 20 of the Lease, which states that, "no rights, easements, or licenses are acquired by Tenant by implication or otherwise except as expressly set forth in the provisions of the Lease" and claims that it was "entitled to rely on the terms of the Lease in which the tenant acknowledged that it possessed no other rights in and to the premises other than those expressly set forth in the Lease." *See* RENEWED MOT. TO DIS. at 13-15.

47.     However, in *PCH-1*, the District Court expressly rejected the exact same argument advanced by the landlord: "the fact that § 3.01 of the Ground Lease contains a disclaimer that the parties intend the Ground Lease to be a lease and nothing else does not prevent an examination of the parties' intent in light of all of the surrounding circumstances." *In re PCH Assocs.*, 55 B.R. 273, 280 (Bankr. S.D.N.Y. 1985), *aff'd*, 60 B.R. 870 (S.D.N.Y. 1986), *aff'd*, 804 F.2d 193 (2d Cir. 1986) (*citing Nath v. Nat'l Equip. Leasing Corp.,* 282 Pa. Super. 142, 151, 422 A.2d 868, 873 (1980), *aff'd*, 497 Pa. 126, 439 A.2d 633 (1981)) (almost identical provision in an equipment lease did not prevent the court from considering the circumstances surrounding the agreement, including the negotiations that led to its execution, and concluding that the agreement was not a true lease); *see also In re Chateaugay Corp.,* 102 B.R. 335, 343 (Bankr. S.D.N.Y. 1989) ("this Court must examine the intent of the parties, the circumstances surrounding their negotiations, and the economic substance of the final transaction. The mere form in which a

particular transaction is cast is not controlling and thus, this Court is not bound either by the parties' characterization of the transaction as a lease or by the terminology (*e.g.,* "rent", "lessee", "lessor") contained therein.").

48.     Moreover, 60G's claim that it had no knowledge of the Prince Transfer is belied by its representations made to the Department of Law of the State of New York (the "**DOL**") that resulted in the DOL's issuance of a "No Action Letter" dated March 4, 2015. Specifically, it represented that it "has inspected the [Building] and the commercial space contained therein" and that it "is a sophisticated real estate investor that understands the complexities of purchasing a commercial condominium unit in the City, County and State of New York [and] has been represented by experienced counsel and real estate professionals throughout its inquiry about the Property and during our discussions prior to entering into a purchase agreement with the Owner." *See* WIENER AFF., Ex. F (*the Broda Affidavit*) ¶¶ 5-7.

49.     According to the affidavit submitted by the shareholders:

> 60G, as the prospective purchaser of the Commercial Unit, ha[s] participated in the contemplated transaction and ha[s] been or will be provided by the Owner … [all] [i]nformation known by Owner and Sponsor which may result in ***extraordinary expenses*** for Shareholders and Purchaser or the Condominium including, but not limited to, assessments, liabilities, dangerous or hazardous conditions, pending litigation, and administrative proceedings ***and all available information related to the current tenant in the Commercial Unit***

*See id.,* Ex. G (¶ 10(e)).

50.     In any event, there is no dispute that at the time 60G purportedly purchased the property, the Lease was duly recorded with the City of the New York's real property records. *See* AMD. COMPL. ¶ 26.[8]

51.     Under New York law, a prospective bona fide purchaser is not only charged with constructive notice of all matters which are in the record (*see In re Hardway Restaurant, Inc.,* 31 B.R. 322, 330 (Bankr. S.D.N.Y. 1983) (*citing Doyle v. Lazarro,* 33 A.D.2d 142, 306 N.Y.S.2d 268 (2nd Dep't 1970), *aff'd,* 33 N.Y.2d 981, 353 N.Y.S.2d 740, 309 N.E.2d 138 (1974)), but in instances "where a tenant is in open visible and continuous possession of real estate, such occupancy can be deemed to put a subsequent purchaser on 'constructive notice' … *of any rights which the tenant may thereafter establish.*" *City Bank of Bayonne v. Hocke,* 168 A.D. 83, 153 N.Y.S. 731 (emphasis added); *see also 1426 46 St., LLC v. Klein,* 60 A.D.3d 740, 743, 876 N.Y.S.2d 425, 427–28 (2009) ("*Actual possession* of real estate is sufficient notice ... to all the world, of the existence *of any right* which the person in possession is able to establish") (*citing Phelan v. Brady*, 119 N.Y. 587, 591–592, 23 N.E. 1109; *Ward v. Ward*, 52 A.D.3d 919, 921, 859 N.Y.S.2d 774)) (emphasis added).

52.     Thus, 60G had, at the very least, constructive notice that the Debtor's 199-year Lease conferred rights significantly different from those arising from the ordinary landlord/tenant relationship, which is more than enough under New York law. *See Stracham v Bresnick*, 76 A.D.3d 1009; 908 N.Y.S.2d 95; 2010 N.Y. App. Div. LEXIS 6767 (2010) ("a mortgagee is under a duty to make an inquiry where it is aware of facts 'that would lead a reasonable, prudent lender to make inquiries of the circumstances of the transaction at issue'") (citing *LaSalle Bank Natl. Assn. v Ally,* 39 AD3d 597, 600, 835 NYS2d 264); Rasch, N.Y.

---

[8] A copy of the Lease, as recorded (ACRIS Doc. ID: FT_1770008625977) and the Assignment of Lease (ACRIS Doc. ID: FT_1760008625976) are annexed hereto as *Exhibits 3 & 4*, respectively.

LANDLORD AND TENANT, § 2:5 [4th ed.] (when there is an attornment, "the tenant will be deemed to hold from the new owner upon the same terms as he previously held from the landlord").

53.    Thus, 60G's claim that it is not bound by the Prince Transfer because it was a "bona fide purchaser," fails as a matter of law and must be rejected. *See Maiorano v Garson,* 65 AD3d 1300, 1303, 886 NYS2d 190 (2009) ("'[w]here a purchaser has knowledge of *any fact,* sufficient to put him [or her] on inquiry as to the existence *of some right or title in conflict* with that he [or she] is about to purchase, he [or she] is *presumed either to have made the inquiry,* and ascertained the extent of such prior right*, or to have been guilty of a degree of negligence* equally fatal to his [or her] claim, to be considered as a *bona fide purchaser*") (*quoting Williamson v Brown*, 15 NY 354, 362 [1857]) (emphasis added).

## IV.    THE DEBTOR HAD THE RIGHT TO ASSERT THE CLAIMS HEREIN AS OF THE PETITION DATE

### A.    The Complaint Does Not Seek to Revive the Lease

54.    60G alleges the exact same argument it did in the First Motion to Dismiss, that the claims asserted in the Amended Complaint "are not plausible under the law because … the Lease was conclusively terminated years before the commencement of Prince's bankruptcy and this Court lacks the authority to revive it." *See* RENEWED MOT. TO DIS. at 15; *see also* MOT. TO DIS. at 14.

55.    However, as discussed at the Hearing, because the Complaint does not seek to revive the Lease, the fact that it was terminated as of the Petition Date is irrelevant.[9]

---

[9] The Court engaged in the following colloquy with 60G's former counsel during the Hearing that is illustrative:

> **MR. EICHEL**:    The second reason the complaint should be dismissed is because the leasehold interest now has been terminated, and the Court lacks the power to revive a terminated lease…

**B. 60G's Argument that the Court Cannot Consider the Relief Requested Herein Because the Lease May Have Been Terminated Pre-Petition Is Entirely Fact-Bound and Meritless**

56.     60G now takes it a step further, and baldly asserts that: "[f]or the Court to even consider recharacterization, the subject lease ***must*** be valid and ***in effect*** at the time of the debtor's bankruptcy filing ***without any legal authority whatsoever***. *See* RENEWED MOT. TO DIS. at 17.

57.     Instead, 60G cites twenty (20) cases where the lease had not been terminated at the time the petition was filed but offers no support for its argument that a valid lease is required for a debtor to seek the relief sought herein.

58.     Nevertheless, it concludes that, "[b]y seeking the unprecedented relief of recharacterization of a lease duly terminated pre-petition, [the Debtor is] ask[ing] this Court to revive the terminated Lease, notwithstanding the ruling of the Appellate Term." *See* RENEWED MOT. TO DIS. at 17-18.

59.     Because 60G's argument cannot be justified on any principled legal basis, it should be disregarded in its entirety.

---

| | |
|---|---|
| **THE COURT**: | Can I interrupt you on that point? |
| **MR. EICHEL:** | Of course, you can, Your Honor…. |
| **THE COURT**: | I didn't follow that argument… The complaint doesn't seek to revive the lease, it seeks a determination that the Debtor transferred or has an ownership interest in the property, and that the lease is really a financing vehicle…. |
| **MR. EICHEL**: | But, Your Honor, if there is no lease or whatever you want to call the document and it's been terminated, then there's nothing, from our perspective, Your Honor, that they can now say exists… Unlike the other cases Your Honor… cited by Prince's counsel and by us [where] the lease, or the document, whatever you want to call it, was still in existence. Here, our position is, that the lease has been terminated, or the document, which gave them rights, has been terminated, and it no longer can be revived, and therefore, they no longer can have an ownership interest. |
| **THE COURT**: | All right. It [just] doesn't make sense. |

*See* HRG. TR. 6:5-7:10.

17

**V.        THE DEBTOR HAS ADEQUATELY PLEADED THE CLAIMS HEREIN**

**A.        Standard of Review**

60.        To survive a motion to dismiss pursuant to Rule 12(b)(6) of the Federal Rules, applicable herein under Rule 7012(b) of the Federal Rules of Bankruptcy Procedure, the complaint must "contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *See Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (*quoting Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).

61.        "Determining whether a complaint states a plausible claim for relief . . . requires the . . . court to draw on its judicial experience and common sense . . . . where the well-pleaded facts do not permit the court to infer more than the mere possibility of misconduct, the complaint has alleged—but it has not shown—that the pleader is entitled to relief." *Id.* at 679 (internal citation and punctuation omitted).

62.        The Second Circuit has explained that, after *Twombly*, the inquiry under Rule 12(b)(6) is guided by two principles: "First, although a court must accept as true all of the allegations contained in a complaint, that tenet is inapplicable to legal conclusions, and [t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice. Second, only a complaint that states a plausible claim for relief survives a motion to dismiss and [d]etermining whether a complaint states a plausible claim for relief will . . . be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Harris v. Mills,* 572 F.3d 66, 72 (2d Cir. 2009) (*quoting Ashcroft v. Iqbal,* 556 U.S. 662, 664, 129 S. Ct. 1937, 1940, 173 L. Ed. 2d 868 (2009)).

63.        The Court must accept the factual allegations set forth in the complaint as true and draw all reasonable inferences in favor of the Plaintiff. *See Walker v. Schult*, 717 F.3d

119, 124 (2d Cir. 2013); *Bold Electric, Inc. v. City of New York*, 53 F.3d 465, 469 (2d Cir. 1995); *Reed v. Garden City Union Free School Dist.,* 987 F. Supp. 2d 260, 263 (E.D.N.Y. 2013).

**B.      The Economic Realities Test**

64.      In determining whether an alleged lease is a "true lease" for purposes of section 365 of the Bankruptcy Code, courts in the Second Circuit are not constrained by the labels placed upon the transaction by the parties, but rather, consider the economic substance of the transaction, and whether "the parties intended to impose obligations and confer rights significantly different from those arising from the ordinary landlord/tenant relationship." *See International Trade Admin. v. Rensselaer Polytechnic Inst.,* 936 F.2d 744, 748 (2d Cir.1991); *In re PCH Assocs.* 804 F.2d 193; *see also In re Best Products Co., Inc.,* 157 B.R. 222, 230 (Bankr.S.D.N.Y.1993) (citing *PCH Associates,* 804 F.2d at 198) ("We apply an 'economic realities' test: while the parties to a transaction may intend that, as between themselves, their relationship be governed by the label they affix, that label neither governs the rights of third parties nor affects the legal consequences of the parties' agreement.").

65.      In *In re Lefrak*, the Court held (Bernstein, B.J.) that:

> Typically, the reported cases address the distinction between 'true' leases and financing arrangements, and apply criteria that focus on that distinction. These include whether the 'rent' reflects compensation for the use of the property or is structured as a return on an investment, whether the purchase price is based on the market value of the land or the amount necessary to finance the transaction, ***whether the property was purchased specifically for the lessee's use***, whether the transaction is structured as a lease for tax reasons, whether the lessee assumes the obligations normally associated with outright ownership and whether the lessee can acquire the property at the end of the term for a nominal payment. Other relevant considerations are ***the length of the lease,*** and ***whether the lease is part of a larger agreement …***

*In re Lefrak*, 223 B.R. 431, 435 (Bankr. S.D.N.Y. 1998) (citing *In re PCH Assocs.*, 804 F.2d at 200–01; *In re KAR Dev. Assocs., L.P.*, 180 B.R. at 639; *In re Barney's, Inc.,* 206 B.R. at 334; *In re Challa*, 186 B.R. 750, 757 (Bankr.M.D.Fla.1995); *In re Hotel Syracuse, Inc.,* 155 B.R. at 838–39; S. Rep. No. 95–989, at 64 (1978)) (emphasis added).

### i. <u>The Prince Transfer Documents Impose No True Rent Obligations</u>

66.　Although 60G makes much of the fact that the "Lease contains no purchase option" (RENEWED MOT. TO DISMISS at 21), the Amended Complaint makes clear that the consideration for the Debtor's interest in the Lease was memorialized by the Security Agreement (as defined in the Amended Complaint) and the Debtor's payment of $40,000 (the "**Purchase Price**"). *See* AMD. COMPL. ¶ 24.

67.　Moreover, in long-term leases, because the "use value" substantially outweighs the present value of the right to acquire the property, the "repurchase option may only have a minimal economic substance." *See* Marshall E. Tracht, *Leasehold Recharacterization in Bankruptcy: A Review and Critique* (N.Y. LAW SCH. LEGAL STUD. RES. PAPER NO. 12/ 13 #42) p. 24, n. 118 (2013) ("In a long-term lease, the use value so swamps the present value of the reversion that ownership of the reversion is no longer an accurate measure of the potential for forfeiture.").

68.　For this reason, 60G's reliance on the fact that the Amended Complaint does not allege "whether the aggregate rental payments have a present value equal to or in excess of the original cost of the leased property" (RENEWED MOT. TO DISMISS at 21) is misplaced. The Amended Complaint sufficiently alleges that, "the property records indicate that … the Purchase Price represented the fair-market value of a fee interest in and to the Premises at the time of the Prince Transfer." *See* AMD. COMPL. ¶ 32.

69.　　In *In re Lefrak*, recognizing that the debtor's 99-year proprietary lease in a cooperative apartment building was not a "true lease," the bankruptcy court for the Southern District of New York (Bernstein, B.J.) held that:

> In order to acquire his cooperative interest, [the debtor] had to make a substantial payment, similar to buying a house, which the Corporation used to fund the acquisition of the building …
>
> Once [the debtor] became a shareholder, he acquired the right to enter into a 98-year proprietary lease. His maintenance obligation under the Lease reflected his *pro rata* share of the Corporation's projected cash requirements, *i.e.,* operating expenses, mortgage and taxes, budgeted annually by the Corporation's board of directors without regard to profit. In this manner, the usual landlord expenses of operating the building were passed through the Corporation directly to the tenant shareholders who bore the ultimate obligation to pay them.

*See Lefrak*, 223 B.R. at 436.

70.　　The distinction between the rights of a proprietary lessee and the usual tenant (albeit in a different context)[10] was aptly articulated by the bankruptcy court in *In re Robertson*:

> [T] he role of the cooperator/shareholder is not the same as that of the typical tenant. Nor does the function of the cooperative achieve the same results of the landlord/tenant relationship…
>
> The cooperator is a stockholder-occupant **who pays one lump sum** (as the Debtor did in this case) **at the beginning of the cooperative/cooperator relationship for the ownership** of the unit and then continues to pay monthly maintenance costs for the expenses incurred in operation of the cooperative corporation. The tenant merely rents a space and pays an equal sum in installments for the duration of his or her tenancy.

---

[10] At issue in *In re Robertson* was whether a proprietary lease could be dispossessed through state court procedures typically available to residential landlords under New Jersey law.

> The cooperators/shareholders are responsible for the expenses related to maintaining the premises amongst themselves… By contrast, the tenant is solely responsible for his monthly payments and depends upon the landlord to properly maintain the premises. If that tenant fails to pay his rent, he subjects himself to removal from the premises. Finally, a cooperative generally is not a money making venture. On the other hand, a landlord rents to tenants for the landlord's own economic benefit.

*In re Robertson*, 147 B.R. 358 (Bankr.D.N.J.1992) (emphasis added).

71.     Here too, the Debtor purchased the Premises by paying the Purchase Price in accordance with the Security Agreement. As the Amended Complaint makes clear, although denominated as "rent," the "rent reserved" under the Lease was proportionate to and represented the share of operating expenses (the "**Maintenance**") attributed to the commercial portion of the Building. *See* AMD. COMPL. ¶ 42; *see also In re Moreggia Sons, Inc*., 852 F.2d at. 1184 ("[B]ecause the obligation to pay 'basic rent' ceased with the retirement of the bonds … [t]he financial obligations remaining are *de minimus* relative to the value of the remaining possessory interest…[t]he obligation under the Lease to pay excess repair and operating costs and possessory interest taxes are conditional and conceivably may never arise … [t]he remaining obligations do not convert the prepaid right of possession for a substantial future term into an ordinary executory lease with current and significant financial obligations.").

### *ii.     The Length of the Lease*

72.     There is no question that the 199-year term of the Lease is "significantly different from […] the ordinary landlord/tenant relationship." *In re PCH,* 804 F.2d at 196 n. 3.

73.     In *Int'l Trade Admin. v. Rensselaer Polytechnic Inst.,* the Second Circuit Court of Appeals reiterated the relevance of this factor:

> In *In re PCH,* we noted the bankruptcy court's finding that the potential 165-year term of the lease there represented 'an

> unusually long term for a true lease. The bankruptcy court considered that as one factor in reaching its conclusion that the lease was not a bona fide lease.

*Int'l Trade Admin. v. Rensselaer Polytechnic Inst.,* 936 F.2d 744, 749–50 (2d Cir. 1991) (citing *In re PCH,* 804 F.2d at 196 n. 3.).

74.    The Second Circuit also noted that, "[a]lthough an unusually long term, standing alone, does not automatically signal that an agreement is not a true lease for the purposes of § 365(d)(4), we find that in combination with other factors, it may lead to such a conclusion." *Id.* (citing *In re Fillard Apartments, Ltd.,* 96 B.R. 397 (Bankr.S.D.Fla.1989) (99-year term lease subject to assumption under § 365(d)(4)); *In re Emory Properties, Ltd.,* 106 B.R. 318 (Bankr.N.D.Ga.1989) (26 year term with option for additional 26 years)).

### *iii.    The Underlying Tax Motives*

75.    Until it was repealed, section 216 of the Internal Revenue Code (26 U.S.C. § 216) allowed shareholders of a cooperative corporation to deduct their portion of maintenance and real estate taxes ***only if*** at least 80% of the gross income of the corporation was derived from payments by tenant-stockholders (the "**80/20 Rule**"). *See* REV. RUL. 68-387; 1968-2 C.B. 112 ("amounts received by a cooperative housing corporation from its tenant-stockholders to defray such expenses as those for providing maid and secretarial service, garage or parking space, utilities, recreational facilities, cleaning, and the services related to providing these conveniences will be considered as gross income that is received from tenant-stockholders for purposes of the 80 percent requirement prescribed by section 216(b)(1)(D) of the Internal Revenue Code.").

76.    Consequently, no more than 20% of the cooperative's gross income could come from commercial tenants or from the operation of a trade or business. *See* 26 U.S.C. § 216; Dale A. Whitman*, Financing Condominiums and Cooperatives,* 13 TULSA L.J. 15 (1977-1978);

Miller, *Tax Problems of the Housing Cooperative under the 80% Income Rule,* 18 PRAC. LAW. 81 (No. 4, Apr. 1972).

77. The purpose of section 216 was to put cooperative tenant-shareholders on an equal footing with homeowners, who can deduct mortgage interest and property taxes under 26 U.S.C. §§ 163 and 164, respectively. *Lefrak,* 223 B.R. at 438 (citing *Eckstein v. United States*, 196 Ct.Cl. 644, 452 F.2d 1036, 1047–48 & 19–20 (1971)).

78. To ensure compliance with the 80/20 Rule, "co-ops often engaged in economically inefficient practices. The simplest approach to limit bad 80/20 income was to charge below-market rent to commercial tenants, such as by writing leases with a 'safety cap' whereby rents would be capped at less than 20 percent of the co-op's gross income for the year." Ezra Dyckman & Seth A. Hagen, *Congress Cooperates with Co-Ops,* N.Y.L.J., February 27, 2008.

79. Further, under section 1.216-1(e)(3) of the Internal Revenue Code, no stockholder was entitled to receive ***any distribution***, other than out of earnings and profits of the corporation, except upon a complete or partial liquidation of the corporation. *See* REV. RUL. 75-547, 1975-2 C.B. 89 ("Although § 216(b)(1)(C) does not specifically qualify the term 'any distribution' as any distribution with respect to stock, a mere distribution from creditor to debtor apart from and incidental to the corporation-stockholder relationship is not within the contemplation of the statute, because the language 'not out of earnings and profits of the corporation except on a complete or partial liquidation of the corporation' clearly contemplates a distribution made with respect to stock.").

80. As a result, "rent" under a typical proprietary lease was often "fixed annually by the board of directors and based on the maintenance and operation costs of the

building, mortgage payments and tax assessments." Philip N. Smith, *A Survey of The Legal Aspects of Cooperative Apartment Ownership,* 16 U. MIAMI L. REV. 305, 313 (1961).

81.     "Any excess receipts attributable to the activities of the organization [would typically be] returned to the [shareholders] in proportion of such member's support of the cooperative relative to the participation of all members in the association" to ensure that it will not be subject to tax. *Cotter & Co. v. United States: The Federal Circuit Finds the Meaning of Subchapter To be Less Than Cooperative*, 47 OHIO STATE L.J. 565, 568-569 (1986).

82.     Here, the "rent" reserved under the Lease, limited to 19.99% of the *corporation's net expenses*, or the "accrued expenses related to the *operation of the building* for a calendar year," was designed to cloak what was in essence a proprietary lease as a commercial lease, and more specifically, was designed as a "safety cap" for Holding Corp. to easily comply with the 80/20 Rule. *See* AMD. COMPL. ¶¶ 30-33; LEASE ¶¶ 43 A & D.

83.     Moreover, by allocating all rent paid to the landlord in excess of the "actual rent due," the Lease provided a specific mechanism for Holding Corp. to ensure that tenant-shareholders paid no more than their proportionate share of expenses. *See* AMD. COMPL. ¶¶ 30-33; LEASE ¶¶ 42 B & D ("rental rate after the first year of the lease will be 19.99% of the net expenses … of the most recent calendar year for which an accounting of the Corporation's expenses has been delivered to the Tenant…. In the event the rental rate exceeds the actual rent due, all monies paid to the Landlord in excess of the actual rent due ***must be returned to the Tenant*** within 30 days after receipt by the Tenant from the Landlord ***of an accounting of said expenses***[.]"). (emphasis added).

84.     Unlike a "true lease," the "rent" under the Lease was structured solely for tax purposes and bears no relationship to the market value of the use and occupancy of the

Premises. *See In re PCH Associates,* 804 F.2d at 196 n.3 ("the fixed rent bore no relationship to the market value of the land; rather, it was strictly the result of trading tax benefits for a higher return from the joint venture.").

### iv. *Whether the Lease Was Part of a Larger Agreement*

85.     In *Lefrak,* the court emphasized that, "the execution of the [l]ease was part of a larger transaction with non-lease attributes," which were inseparable from the shares and "cannot be viewed in isolation." 223 B.R. at 436 (*citing State Tax Comm'n v. Shor,* 400 N.Y.S.2d 805, 371 N.E.2d 523, 524 (N.Y. 1977); *Fe Bland v. Two Trees Management Co.*, 66 N.Y.2d 556, 489 N.E.2d 223, 227 (N.Y. 1985)).

86.     Here too, the Amended Complaint sufficiently alleges that the Lease was just one of the Prince Transfer Documents effectuating the Prince Transfer and should not be viewed in isolation.

87.     Accordingly, the Debtor submits that the Amended Complaint adequately states a claim for relief that is plausible on its face under the standard adopted by the Supreme Court in *Iqbal* and *Twombly.*

### **CONCLUSION**

For all the foregoing reasons, the Court should deny the Joinder and the Renewed Motion to Dismiss in their entirety.

*[signature page follows]*

Dated: New York, New York
April 8, 2021

**ROSEN & ASSOCIATES, P.C.**
*Counsel to the Debtor/Plaintiff*

By: _/s/ Sanford P. Rosen_
Sanford P. Rosen
Paris Gyparakis

747 Third Avenue
New York, NY 10017-2803
(212) 223-1100