UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK

———————————————————————x

In re:

Prince Fashions, Inc.,

                Debtor.

———————————————————————x

Prince Fashions, Inc.,

                Plaintiff,

      -against-

60G 542 Broadway Owner, LLC and
542 Holding Corp.,

                Defendants.

———————————————————————x

Chapter 11
Case No. 19-23079(LGB)

Adv. Pro. No. 19-08714 (LGB)

## PLAINTIFF PRINCE FASHIONS, INC.'S MEMORANDUM OF LAW IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT

**LOUIS FOGEL & ASSOCIATES**
Louis Fogel
LouisFogel@LouisFogellaw.com

5 Nottingham Road
Annandale, New Jersey  08801
(908) 730-7692

200 Water Street, Suite 1403
New York, New York 10038
(212) 944-1580

*Attorney for Plaintiff Prince Fashions, Inc.*

## Table of Contents

| | | |
|---|---|---|
| Table of Authorities | | -ii- |
| Preliminary Statement | | 1 |
| Procedural History | | 3 |
| Standard Of Review | | 5 |
| Facts | | 6 |
| Argument | | |
| Point I | The Lease Should Be Recharacterized As A Sale | 10 |
| Point II | 60G Was Not A *Bona Fide* Purchaser For Value | 17 |
| Conclusion | | 21 |

## Table of Authorities

### Cases

*436 Franklin Realty, LLC v. U.S. Bank N.A.*, 188 A.D.3d 960,
961-62 (2d Dep't 2020)                                                            17

*1426 46 St., LLC v. Klein,* 60 A.D.3d 740, 743 (2d Dept. 2009)                   19

*Akasa Holdings, LLC v. 214 Lafayette House, LLC*, 177 A.D.3d 103,
104-05 (1st Dep't 2019)                                                           17

*Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505,
2514, 91 L.Ed.2d 202 (1986)                                                       5

*Barney's, Inc. v. Isetan Co. (In re Barney's, Inc.),* 206 B.R. 328, 332
(USBC SDNY 1997)                                                                  12

*Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548,
2556 n. 2, 91 L.Ed.2d 265 (1986)                                                  5

*Federal Deposit Ins. Corp. v. Bernstein,* 944 F.2d 101, 106 (2d Cir.1991)       5

*Gregg v. M & T Bank Corp.*, 160 AD3d 936, 940 (2d Dept 2018)                     18

*Herman v. 36 Gramercy Pk. Realty Assoc., LLC*, 2017 N.Y. Misc.
LEXIS 1536, at *39 (Sup. Ct. N.Y. Co. Apr. 21, 2017)                             18

*In Re Hotel Syracuse, supra,* 155 B.R. 824, 840 (USBC SDNY 1998            11, 12, 17

*In re KAR Dev. Assocs., L.P.,* 180 B.R. 629, 638 (USBC D. Kan. 1995)            12

*In re Keydata Corp.,* 18 B.R. 907, 909 (USBC D.Mass. 1982)                      11

*In re Moreggia & Sons, Inc.,* 852 F.2d 1179, 182-83 (9th Cir. 1988)             12

*In re PCH Associates v. PCH Associates,* 804 F.2d 193, 200 (2d. Cir. 1986)      11-16

*In Re TAK Broadcasting Corp.*, 37 B.R. 728 (USBC WD Wisc. 1992)                 17

*International Trade Administration v. Rensselaer Polytechnic Inst.,*
936 F.2d 744, 748 (2d. Cir. 1994)                                         10-12, 14, 16

*In Re Lefrak v. Lefrak*, 223 B.R. 431, 435 (USBC SDNY 1998)       10, 12, 14, 15

*Jarns Holdings v. Huang*, 2007 NYLJ LEXIS 1841, at \*3
(Civ. Ct. N.Y. Co. July 23, 2007)       17

*Nath v. National Equipment Leasing Corp.,* 282 Pa.Super. 142, 153 n. 8,
422 A.2d 868, 873 n. 8 (1980), *aff'd,* 497 Pa. 126, 439 A.2d 633 (1981)       11

*Nethaway v. Bosch,* 199 A.D.2d 654, 655 (3d Dep't 1993)       19

*Sun Oil Co. v. Commissioner*, 562 F2d 258, 263 (3d Cir. 1977)       11

**Statutes**

Federal Rules of Civil Procedure, Rule 56       1, 5

NY RPAPL 290(3)       18

U.S. Bankruptcy Code 365       2

U.S. Bankruptcy Code 502(b)(6)       14

Debtor/Plaintiff Prince Fashions, Inc. ("Prince"), by its undersigned counsel, respectfully submits this Memorandum of Law in support of its motion pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment in favor of Prince and against defendants 542 Holding Corp. ("542 Holding") and 542 60G Broadway Owner, LLC ("60G" and collectively with 542 Holding Corp., "Defendants"), as follows: (a) granting Prince summary judgment on Phase I of its claim for recharacterization of a lease (the "Lease") for Prince's commercial space located at 542 Broadway in New York City ("Prince's Space") as a sale (Count I in the Amended Complaint); (b) dismissing 60G's affirmative defenses that it was a *bona fide* purchaser for value of Prince's Space when it purported to purchase Prince's Space from 542 Holding ("60G's Acquisition") with knowledge of the Lease (First, Second and Third Affirmative Defenses in 60G's Answer to the Amended Complaint); and (c) scheduling additional proceedings for Phase II to determine the damages and other relief to which Prince is entitled.

## PRELIMINARY STATEMENT

Prince's Space consists of valuable retail stores on the ground floor of a 6-story mixed-use commercial and residential building (the "Building") located at 542 Broadway in New York City (the "Property") that was owned and controlled by David Silverstein. Acting through 542 Equities Associates ("542 Equities"), in which Mr. Silverstein was the sole partner, and 542 Holding, of which he was the president, on April 11, 1980, Mr. Silverstein had 542 Equities, which was the record owner of the Property, transfer the Property to 542 Holding. On the same date, 542 Holding, now as the owner/landlord, then entered into the Lease back to 542 Equities, now as the tenant. The transfer by and Lease back to 542 Equities occurred in connection with 542 Equities, as sponsor, converting the Building to a cooperative housing corporation. On April

1

22, 1980, 542 Equities assigned the Lease to Prince. (the "Assignment"). The Lease and the Assignment are duly recorded.

Shortly after Mr. Silverstein was no longer associated with 542 Holding, 542 Holding launched a years-long campaign against Prince seeking to take possession of Prince's Space, including protracted litigation in New York State Court (the "State Court Litigation"). Its purpose was to take for itself the substantial profits Prince enjoys from leasing Prince's Space to its own tenants at market rates, which are much higher than Prince's rent because Prince's rent is only the agreed percentage of the Building's net operating expenses attributable to Prince's Space. 60G had actual knowledge of Prince, the Lease, the Assignment and the State Court Litigation and assumed the Lease and responsibility for the State Court Litigation from 542 Holding as part of 60G's Acquisition.

Prince is entitled to recharacterization of the Lease as a sale because the economic substance of the transaction compels the conclusion that the Lease is not a "true lease" under Section 365 of the Bankruptcy Code and was intended to confer rights and impose obligations different from those ordinarily arising under a landlord/tenant relationship. This conclusion is warranted based on multiple factors the Courts consider on a claim for recharacterization, rather than relying on the form or labels the parties applied to the transaction. Among others, these tell-tale factors include: (1) whether the "rent" was calculated to compensate and profit the lessor for the fair market use of the space -- which the "rent" under the Lease is not, or for some other purpose -- which the "rent" under the Lease is, supporting a finding that the Lease is not a true lease; (2) whether a lease has an unusually long term -- the Lease term is 99 years, plus options for the lessee to extend the Lease on the same terms for an additional 100 years, for a total of 199 years, also supporting a finding that the Lease is not a true lease; and (3) whether a lease contains

other indicia of conveying an ownership interest to the lessee -- which the Lease also does (*e.g.*, the lessee has the exclusive right to profit from, use, lease, assign, encumber and mortgage Prince's Space; the lessee effectively pays the taxes, insurance and all other Building expenses attributable to Prince's Space).

Given that Mr. Silverstein, through 542 Equities, first transferred the Property to 542 Holding, and then through 542 Holding, as lessor, immediately entered into the Lease back to himself, through 542 Equities, as lessee, it is not surprising that he gave himself all these indicia of ownership in the Lease. Under controlling case law, this bundle of rights and obligations compels the conclusion that the economic substance of the transaction is not a true lease and that the Lease should be recharacterized as a sale.

Significantly, 60G cannot defeat Prince's claim with its *bona fide* purchaser defenses because it is undisputed that prior to 60G's Acquisition of Prince's Space in 2015, approximately 35 years after the Lease and the Assignment, 60G had knowledge of facts putting it on inquiry notice that the Lease could be recharacterized, and the record is devoid of any facts showing that 60G did anything to meet its inquiry notice obligations. On that basis, 60G cannot maintain *bona fide* purchaser status and thus made 60G's Acquisition at its own risk -- whether it failed to recognize the risks posed by the facts at that time -- or recognized the risks and chose to proceed anyway.

## PROCEDURAL HISTORY

Prince filed this bankruptcy case in 2019, following years of litigation between the parties in the State Court Litigation. (Declaration of Doron Zabari dated March 11, 2024 ("Zabari Decl."), par. 9.)

3

Prince filed its Complaint in this adversary proceeding on November 22, 2019. (Declaration of Louis Fogel, Esq. dated March 11, 2024 ("Fogel Decl."), par. 4)

On July 14, 2020, this Court (Judge Drain) granted Defendants' motion to dismiss the Complaint on the ground that it failed to state a claim because it lacked sufficient factual allegations, subject to Prince's right to amend the Complaint to add sufficient factual allegations, and rejected the other grounds for dismissal on which the motion was based, including that the claims were barred by the State Court Litigation. (Fogel Decl., Ex. D.)

Prince filed an Amended Complaint on October 30, 2020. (Fogel Decl., Ex. E.) In Count I, Prince seeks an order and judgment declaring that the Lease is not a true "lease" under and is not subject to the provisions of section 365 of the Bankruptcy Code, that the Lease and Assignment memorialized the transfer of ownership of Prince's Space to Prince and that Prince is the owner of Prince's Space. Count II is for wrongful prosecution of the State Court Litigation.

On September 3, 2021, this Court (Judge Drain) denied 60G's motion to dismiss Count I in the Amended Complaint on all grounds on which the motion was based, including that 60G was a *bona fide* purchaser for value. The Court granted the motion to dismiss Count II in the Amended Complaint, without prejudice to asserting it "as an ultimate remedy based on recharacterization" in Phase II. (Fogel Decl., Ex. F.)

542 Holding filed an Answer to the Amended Complaint on December 10, 2020. (Fogel Decl., Ex. G.)

60G filed an Answer to the Amended Complaint on October 4, 2021.  The First, Second and Third Affirmative Defenses allege that 60G is a *bona fide* purchaser for value.  (Fogel Decl., Ex. H.)

## STANDARD OF REVIEW

Rule 56(c) of the Federal Rules of Civil Procedure ("Fed.R.Civ.P.") is applicable in the United States Bankruptcy Courts pursuant Rule 7056 of the Federal Rules of Bankruptcy Procedure.  It provides that summary judgement must be granted where there exists "no genuine issue as to any material fact [such] that the moving party is entitled to judgment as a matter of law." *Federal Deposit Ins. Corp. v. Bernstein,* 944 F.2d 101, 106 (2d Cir.1991) (quoting Fed.R.Civ.P. 56(c)). The moving party has the burden to establish that no issue of material fact exists. *See Id.* (citing *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 256, 106 S.Ct. 2505, 2514, 91 L.Ed.2d 202 (1986) and *Celotex Corp. v. Catrett,* 477 U.S. 317, 330 n. 2, 106 S.Ct. 2548, 2556 n. 2, 91 L.Ed.2d 265 (1986)).

Here, the record is clear that no issue of material fact exists on Prince's claim for recharacterization of the Lease and that Prince is entitled to judgment against 60G and 542 Holding on Phase I of that claim as a matter of law.  Likewise, the record is also clear that no issue of material fact exists on 60G's affirmative defenses that it was a *bona fide* purchaser for value when it made 60G's Acquisition with knowledge of Prince, the recorded Lease, the recorded Assignment and the State Court Litigation and that Prince is also entitled to judgment dismissing those defenses as a matter of law.

## FACTS

The facts are set forth in Prince's Statement of Material Facts submitted in support of this motion and copied below for the Court's convenience.

1.      On April 11, 1980, 542 Equities was the owner of the Property and transferred it to 542 Holding.  (Fogel Decl., Ex. I).

2.      On the same date, April 11, 1980, 542 Holding, as lessor, immediately entered into the Lease back to 542 Equities, as lessee.  (Zabari Decl., Ex. A)

3.      David Silverstein ("Mr. Silverstein") signed the Lease for 542 Holding as its president. (Id., signature page; Acknowledgements)

4.      Mr. Silverstein also signed the Lease for 542 Equities as its sole partner.  (Id.)

5.      On the same date, April 11, 1980, 542 Holding also gave Mr. Silverstein a mortgage on the Property to secure a $200,000 loan.  (Fogel Decl., Ex. J)

6.      On April 22, 1980, 542 Equities made the Assignment to Prince.  (Zabari Decl., Ex. B)

7.      The Lease and the Assignment were duly recorded in the Office of City Register, New York County, on June 2, 1980.  (Zabari Decl., Ex. A, Ex. B).

8.      Mr. Silverstein's transfer of the Property from 542 Equities to 542 Holding, Lease back to 542 Equities, Assignment to Prince and mortgage from 542 Holding to Mr. Silverstein occurred in connection with Mr. Silverstein, through 542 Equities, as sponsor, converting the Building to a cooperative housing corporation (Fogel Decl., Ex. I; Ex. J; Ex. L (see Exhibit "C", "Cover Page of Offering Plan" within Ex. L); Zabari Decl., Ex., R pars. 1-5),

which enabled Mr. Silverstein to realize the value from the sale of the residential apartments in the Building and Prince's Space.

9.      Pursuant to a security agreement also dated April 22, 1980, Prince agreed to pay 542 Equities $40,000 for the Assignment over a period of 48 months and granted 542 Equities a security interest in and mortgage to the Lease and Assignment to secure the payment (the "Security Agreement"). (Zabari Decl., Ex. C)

10.     At the time of the Assignment and the Security Agreement, the owners of Prince were Herman Yankowitz and Miclob Katz, who are deceased. (Zabari Decl., par. 5.)

11.     Prince's current ownership acquired Prince in 1995 with the understanding that the Lease represented ownership of Prince's Space. (Id., par. 6.)

12.     Prince's Space is Prince's sole business asset and the Lease, Assignment and Security Agreement are records maintained by Prince in the ordinary course of business. (Id., par. 7.)

13.     Prince's Space is valuable commercial space consisting of stores on the ground floor (and an associated basement and vault area) of the Building. (Id., par. 3; Fogel Decl., Ex. Q, par. 3)

14.     Under the Lease, Prince may use Prince's Space "any lawful purpose." (Zabari Decl., Ex. A, p. 1)

15.     Prince's rent under the Lease is 19.99% of the Building's net operating expenses. (Zabari Decl., Ex. A, pars. 42, 43.A.)

7

16.     Prince's rent under the Lease is substantially below the fair market rental value of Prince's Space.  According to 60G, as of October 2017, Prince was paying 60G "a mere $2,000 per month for over 3,400 square feet of prime retail space in the heart of the SoHo retail corridor while Prince is collecting tens of thousands of dollars every month from its commercial subtenants" [for Prince's Space]."  (Fogel Decl., Ex. Q, par. 3; Zabari Decl., par. 4)

17.     Also according to 60G, as of July 2016, the fair market value of the rent for Prince's Space was at least $205,495.33 per month.  (Fogel Dec., Ex. Q, par. 10.)

18.     The initial Lease term is 99 years.  (Zabari Decl. Ex. A, p.1.)

19.     The Lease also includes options for Prince to extend the term of the Lease for an additional 100 years, for a total term of 199 years (the "Options"). (Zabari Decl., Ex. A, par. 47.)

20.     Prince's Options are on the same terms as the Lease (e.g., Prince's rent remains 19.99% of the Building's Expenses). (Id.)

21.     There is no fee or any other consideration payable by Prince to obtain the Options.  (Id.)

22.     There is no fee or any other consideration payable by Prince to exercise the Options.  (Id.)

23.     The Lease imposes on Prince the obligations to pay the agreed percentage of the Building's net expenses (including taxes and insurance) attributable to Prince's Space.  (Zabari Decl., Ex. A, pars. 42, 43.A.)

24.     The Lease confers on Prince the rights to sublet, assign, mortgage and encumber the Lease and Prince's Space.  (Zabari Decl., Ex. A, par. 44.)

8

25.    The Lease gives Prince the right to exercise rights conferred by the Lease, including the rights described in paragraph 24 above, without 542 Holding's consent. (Id.)

26.    The Lease confers on Prince's successors the rights to sublet, assign, mortgage and encumber the Lease and Prince's Space. (Id.)

27.    The Lease gives Prince's successors the right to exercise rights conferred by the Lease, including the rights described in paragraph 26, without 542 Holding's consent. (Id.)

28.    The Lease does not require Prince to comply with 542 Holding's Rules and Regulations. (Zabari Decl., Ex. A, par. 35, Acknowledgements page.)

29.    In 2015, 542 Holding converted Prince's Space to a commercial condominium (the "Condo Conversion") and purported to sell it to 60G for $778,179 ("60G's Acquisition"). (Fogel Decl., Exs. I, K,  N, O; Zabari Decl, Exs. L, M)

30.    In its application for the Condo Conversion, 542 Holding Corp. failed to disclose the existence of Prince, the Lease and the Assignment. (Zabari Decl., Ex. L)

31.    Shortly after Doron Zabari became involved with Prince in 1995, Mr. Silverstein sold his residential cooperative unit in the Building and was no longer associated with 542 Holding. (Zabari Decl., par. 8)

32.    At or around that time, 542 Holding launched a years-long campaign against Prince seeking to take possession of Prince's Space, including protracted litigation in the State Court Litigation. (Id.)

33.    Its purpose was to take for itself the substantial profits Prince enjoys from leasing Prince's Space to its own tenants at market rates, which are much higher than Prince's rent

because Prince's rent is only the agreed percentage of the Building's net operating expenses attributable to Prince's Space. (Id.)

34.     Prince filed this bankruptcy case following years of the State Court Litigation. (Zabari Decl., par. 9)

35.     Prior to 60G's Acquisition, 60G had actual knowledge of Prince, the Lease, the Assignment and the State Court Litigation. In the purchase and sale agreement for 60G's Acquisition (the "PSA"), 60G accepted and assumed the Lease from 542 Holding, as well as responsibility for the State Court Litigation against Prince. (Fogel Decl., Ex. K, e.g., sections. 1.1, 3.2, 4.3, 71(i), 7.2(a), 7.2(c), 7.2(d), 7.3(a))

36.     60G also assumed responsibility for the State Court Litigation against Prince in a promissory note it signed in favor of its lender (the "Lender") for 60G's Acquisition. (Fogel Decl., Ex. P, Schedule 2 Covenants, Section C.5)

37.     After 60G 's Acquisition, the Lender filed a foreclosure action against 60G (the "Foreclosure Action"). (Zabari Decl, Ex. S)

38.     After the Lender obtained a judgment in the Foreclosure Action, the parties entered into a Stipulation Vacating Judgment of Foreclosure and Sale in the Foreclosure Action and discontinuing the Foreclosure Action. (Zabari Decl, Ex. T)

## ARGUMENT

## POINT I       THE LEASE SHOULD BE RECHARACTERIZED AS A SALE

Recharacterization of a lease is warranted where, as here, "the parties intended to impose obligations and confer rights significantly different from those arising from the ordinary

10

landlord/tenant relationship.[1] " *International Trade Administration v. Rensselaer Polytechnic Inst.,* 936 F.2d 744, 748 (2d. Cir. 1994) (quoting *In re PCH Associates v. PCH Associates,* 804 F.2d 193, 200 (2d. Cir. 1986). In making this determination, a court looks "to the economic realities of the lease and not to the labels applied by the parties" to determine the true nature of a transaction." *In re PCH Associates, supra,* 804 F.2d 193 at 200 (quoting *Sun Oil Co. v. Commissioner*, 562 F2d 258, 263 (3d Cir. 1977). See also *In Re Hotel Syracuse v. City of Syracuse Industrial Development Agency,* 155 B.R. 824, 838 (USBC SDNY 1993) (holding that titling a document as a lease which described itself as a "rental agreement to use real property" does not establish that it was a "true lease" under Bankruptcy Code § 365(d)(4)) (citing *In re PCH Associates, supra,* 804 F.2d at 199). *See also Nath v. National Equipment Leasing Corp.,* 282 Pa.Super. 142, 153 n. 8, 422 A.2d 868, 873 n. 8 (1980), *aff'd,* 497 Pa. 126, 439 A.2d 633 (1981); *In re Keydata Corp.,* 18 B.R. 907, 909 (Bankr.D.Mass.1982)."

Rather than relying on form, "the court must look to the economic substance of the transaction" to determine whether it is in fact a "true" lease. *See International Trade Administration, supra,* 936 F.2d at 748. "The bankruptcy court is to look to the circumstances of the case and consider the economic substance of the transaction rather than "the locus of title, the form of the transaction or the fact that the transaction is denominated as a 'lease,' " to determine whether the transaction embodies a "true lease…" *In re PCH Associates, supra,* 804 F.2d at 199 (citing S.Rep. No. 989, 95th Cong., 2d Sess. 64, *reprinted in* 1978 U.S.Code Cong. & Ad.News 5787, 5850)

---

[1] Unlike the Lease here, the usual landlord-tenant relationship involves (among other things), a landlord acquiring a property for its own benefit and then renting it at a profit under a relatively short lease term, under which a tenant does not pay the operating costs typically associated with ownership and does not "face the risks or enjoy the rewards of fluctuating values in the real property market… or acquire an asset that it can pledge or sell…" *In Re Lefrak v. Lefrak*, 223 B.R. 431, 435 (USBC SDNY 1998).

"Moreover, while state law determines whether an agreement is a lease, merely meeting the state definition of a lease does not mandate the unthinking application of § 365(d)(4)." *In re Moreggia & Sons, Inc.,* 852 F.2d 1179, 182-83  (9th Cir. 1988). "It is well-settled that section 365 applies only to "true" or "bona fide" leases (citing *International Trade Admin., supra,*  936 F.2d at 748;  *In re PCH Assocs., supra,* 804 F.2d at 198–99) and its applicability presents a question of federal law."  *In Re LeFrak v. LeFrak*, 223 B.R. 431, 434 (USBC SDNY 1998) (citing *Barney's, Inc. v. Isetan Co. (In re Barney's, Inc.),* 206 B.R. 328, 332 (Bankr.S.D.N.Y.1997). Thus, while state law may treat the agreement as a lease, this does not mandate the application of section 365.  *In re Moreggia & Sons, supra,* 852 F.2d at 1182–83 (9th Cir.1988); *In re KAR Dev. Assocs., L.P.,* 180 B.R. 629, 638–39 (D.Kan.1995); *Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Agency (In re Hotel Syracuse, Inc.*), 155 B.R. 824, 838 (Bankr.N.D.N.Y.1993).

Certain factors are relied on by the Courts to analyze the economic substance of a transaction and determine whether a lease should be recharacterized.  Application of those factors to the Lease dictates the conclusion that it is "intended to impose obligations and confer rights significantly different from those arising from the ordinary landlord/tenant relationship" and should be recharacterized as a sale on that basis.

A primary factor in the analysis is whether the "rent" is calculated to compensate and profit the lessor for the fair market use of the space, or for some other purpose.  A finding that the "rent" is structured for some other purpose supports a conclusion that a transaction is not a true lease.  See *In Re Hotel Syracuse, supra,* 155 B.R. 824, 840 (holding that a lease in which the "rental" payments were not structured to compensate the lessor for the fair market use of the land was not a true lease): "The primary difference is the nature of the rental payments which were structured primarily for the purpose of amortizing the amount due on the outstanding bonds,

rather than, as would characterize a normal lease, to assure payment of a profit to [the lessor] stemming from the Debtor's use and occupation of the Hotels." (citing *International Trade Administration*, *supra*, 936 F.2d at 751). See also, *In Re Lefrak*, supra, 223 B.R. 431, 435, (USBC SDNY 1998) (holding that a lease was not a true lease where the "rent" did not reflect compensation for the use of the property and was structured for another purpose, *i.e.*, to cover the lessee's *pro rata* share of the landlord's building expenses, without regard to profit, so as to pass through to the tenants the landlord's operating expenses for the building). See also *In Re PCH, supra*, 804 F2d at 200-01 (holding that a lease was not a true lease where "the rent was not calculated to compensate [the lessor] for the use of the property; rather the parties structured the "rent" solely to ensure [the lessor's] return on its investment.")

Here, the "rent" under the Lease is clearly not calculated to compensate and profit the lessor for the fair market use of Prince's Space. Rather, it is permanently fixed at "19.99% of the net expenses of the building" each year for the entire term of the Lease. (Zabari Decl., Ex.A, p.1) This is clearly designed for the obvious purpose of passing through to the lessee the agreed percentage of the Building's expenses attributable to Prince's Space - without regard to profit.

Moreover, it is undisputed that the "rent" under the Lease is substantially below market for Prince's Space and is structured to provide the right to derive all profits for the fair market use of Prince's Space to the lessee. According to 60G, as of October 2017, Prince was paying 60G "a mere $2,000 per month for over 3,400 square feet of prime retail space in the heart of the SoHo retail corridor while Prince is collecting tens of thousands of dollars every month from its commercial subtenants" [for Prince's Space]." (Fogel Decl. Ex. Q, par. 3.) Also according to 60G, as of July 2016, the fair market value of the rent for Prince's Space was at least 205,495.33 per month. (Id., par. 10.) Based on the controlling case law, these key facts showing that the

13

"rent" is not structured to profit the lessor strongly support a finding that the Lease is not a true lease and should be recharacterized as a sale.

Another key factor relied on by the Courts in analyzing the economic substance of a transaction is the length of the lease term. An unusually long term also supports a finding that the Lease is not a true lease. *In Re Lefrak, supra*, 223 B.R. 431 (holding that a lease with a term of 98 years was not a true lease); *International Trade Administration, supra* 936 F.2d 744 (holding that a lease with a term of 99 years was not a true lease); *In re PCH Associates, supra,* 804 F.2d 193 (holding that a lease with a term of 165 years was not a true lease).

Here, the Lease has an initial term of 99 years (Zabari Decl., Ex. A, par. 1) and the Lease also grants the lessee the Options to extend the Lease for an additional 100 years (Id., par. 47), for a total term of 199 years. Tellingly, the lessee's right to extend the Lease for an additional 100 years is on the same terms. (Id.) Also significantly, lessee did not have to pay any additional fee or other consideration (not even a nominal sum) to obtain the Options, and no additional fee or other consideration (not even a nominal sum) is payable by the lessee to exercise the Options. Based on the case law, these key facts showing that the Lease term is unusually long and can be extended for further unusually long extensions, and at no cost and on the same terms no less, especially in combination with the other factors also present here, further demonstrate that the Lease imposes obligations and confers "rights significantly different from those arising from the ordinary landlord/tenant relationship" and should be recharacterized.

An additional key factor considered by the Courts in analyzing the economic substance of a transaction is whether the lessee assumed many of the expenses usually associated with

ownership, including taxes and insurance.[2]  Such an assumption also supports a finding that the

Lease is not a true lease.  *See In re PCH Associates, supra,* 804 F.2d at 200–01 (citations

omitted)."  See also *In re Lefrak v. Lefrak*, 223 BR 431 (1998).

Under the Lease here, the lessee clearly pays those expenses.  As noted above, the "rent"

under the Lease is "19.99% of the net expenses of the building…as defined in paragraph 43,"

representing the agreed percentage of the Building expenses attributable to Prince's Space.

(Zabari Decl., Ex. A, par. 1.)  In relevant part, paragraph 43 of the Lease says "[n]et expenses are

accrued expenses related to the operation of the building for a calendar year…"  This includes

taxes, insurance and debt service, among other expenses.  (Zabari Decl., Ex. A, par. 43.)  The

definition of "Net expenses" in paragraph 43 also expressly includes repairs and maintenance.

(Id.) Pursuant to these provisions, the lessee is responsible for paying its agreed 19.99% of the

ownership carrying costs attributable to Prince's Space.  In this manner, the "rent" is essentially

equivalent to the monthly maintenance fee the Building collects under a proprietary lease from

each residential cooperative apartment for its agreed share of the Building expenses.  Moreover,

the Lease also provides that 542 Holding will provide Prince an accounting of the net expenses

to show the rent due and that "all monies paid to the Landlord in excess of the actual rent due

must be returned to the Tenant within 30 days after receipt by the Tenant from the Landlord of

an accounting of said expenses."  (Zabari Decl, Ex. A, par. 43.A.)  Based on the case law, these

---

[2] "As noted in the *Senate Report* on section 502(b)(6) of the Bankruptcy Code:  [T]he fact that the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed to the outright ownership of the property is more indicative of a financing transaction than of a true lease. The rental payments in such cases are in substance payments of principal and interest either on a loan secured by the leased real property or on the purchase of the leased real property. In Re PCH I, 804 F2d 193 804 F.2d 193 (1986). (citations omitted)

facts showing that Prince pays expenses usually associated with ownership also strongly support the conclusion that the Lease is not a true lease and should be recharacterized as a sale.

While the foregoing facts warrant recharacterization, the Lease contains still further indicia of ownership. First, the Lease confers on the lessee the right to use Prince's Space "for any lawful purpose." (Zabari Decl., Ex. A, p.1) Second, the Lease confers on the lessee the valuable rights to sublease, assign, mortgage and encumber the Lease and Prince's Space. (Zabari Decl., Ex. A, par. 47.) Third, the lessee has the unfettered freedom to exercise those typical ownership rights without the lessor's consent. (Id.) Fourth, all such ownership rights are also conferred on the lessee's "heirs, distributees, executors, administrators, legal representatives, successors and assigns." Fifth, the lessee's heirs, distributees, executors, administrators, legal representatives, successors and assigns also have the unfettered freedom to exercise those typical ownership rights without the lessor's consent. (Id.) Sixth, the Lease does not require Prince to comply with 542 Holding's Rules and Regulations. (Zabari Decl., Ex. A, par. 35, Acknowledgements page.) These terms further add to the bundle of ownership rights evident in the Lease which, in combination, amply demonstrate that the economic substance of the Lease is not a true lease because it imposes obligations and confers rights significantly different from those arising from the ordinary landlord/tenant relationship.[3]

Given that Mr. Silverstein, through 542 Equities, first transferred the Property to 542 Holding, and then through 542 Holding, as lessor, immediately entered into the Lease back to

---

[3] Especially where, as here, there is ample evidence the Lease is not a true lease, the fact that a lessor may retain a certain degree of control over the property does not alter the conclusion. *See International Trade Admin. v. RPI,* 936 F2d 744 (2d Cir. 1991), which held that a lease was not a true lease notwithstanding the lessor's "continued exercise of a degree of control over the property, evident for example in its continued right to inspect the premises, or its right to approve assignments and improvements."

16

himself, through 542 Equities as lessee, it is not surprising that he gave himself all these indicia

of ownership in the Lease.[4]  *In Re PCH Associates, supra*, 804 F.2d 193 (holding that a

sale/leaseback was not a true lease).  See also, *In Re Hotel Syracuse, supra*, 155 B.R. 824

(holding that lessor's acquisition of property for lessee's use supports finding that lease was not a

true lease.)  See also *In Re TAK Broadcasting Corp.*, 37 B.R. 728 (USBC WD Wisc. 1992)

(holding lease that was part of a larger transaction was not a true lease.)

For all these reasons, Prince is entitled to have the Lease recharacterized as a sale.

## POINT II      60G WAS NOT A *BONA FIDE* PURCHASER FOR VALUE

Notwithstanding Prince's entitlement to have the Lease recharacterized, 60G asserts

defenses alleging that 60G is still in the clear because it was a *bona fide* purchaser for value

("BFP") in 60G's Acquisition of Prince's Space in 2015.  (See Fogel Decl., Ex. H, First, Second

and Third Affirmative Defenses.)  These defenses are fatally flawed because 60G cannot satisfy

the elements necessary to achieve BFP status.

BFP status "has two elements: paying value and taking in good faith with no notice of the

prior conveyance."  *Akasa Holdings, LLC v. 214 Lafayette House, LLC*, 177 A.D.3d 103, 104-05

(1st Dep't 2019) (quoting Dale A. Whitman, Ann M. Burkhart, R. Wilson Freyermuth & Troy A.

Rule, Property § 11.10 at 774 (4th ed. 2019) (emphasis added).)[5]  "Notice of the prior

conveyance" means actual or constructive knowledge (*see 436 Franklin Realty, LLC v. U.S. Bank

N.A.*, 188 A.D.3d 960, 961-62 (2d Dep't 2020)), and the lease at issue is considered a

"conveyance" as it is for a term greater than three years.  *See, e.g., Jarns Holdings v. Huang*,

---

[4] In a Complaint 542 Holding filed in the State Court Litigation, it concedes that "[t]je Lease was not an
arm's length impartial transaction between the Sponsor [542 Equities] and the Coop (542 Holding) ,
which was then controlled by the Sponsor.  The Sponsor drafted the Lease, caused the Coop to enter into
the Lease with it, and then assigned the Lease to Prince."   (Zabari Decl., Ex. R, par. 5.)

[5] The cases use the words "good faith" with both elements, and not as an independent element.

2007 NYLJ LEXIS 1841, at *3 (Civ. Ct. N.Y. Co. July 23, 2007) ("The lease at issue is

considered a 'conveyance' under RPAPL 291, as it is for a term exceeding three years, and

pursuant to the statute must be recorded in order to be valid as against petitioner, provided

petitioner is a subsequent purchaser in good faith and for valuable consideration.).[6]  Accordingly,

"[t]he status of a good faith purchaser for value cannot be maintained by a purchaser with either

notice or knowledge of a prior interest or equity in the property, or one with knowledge of facts

that would lead a reasonably prudent purchaser to make inquiries concerning such." *Gregg v. M

& T Bank Corp.*, 160 AD3d 936, 940 (2d Dept 2018).

Here, 60G cannot satisfy the "notice" element because it is undisputed that, before 60G's

Acquisition, 60G had knowledge of facts putting it on inquiry notice that the Lease could be

recharacterized.  First, there is no dispute that the Lease and Assignment were recorded.  (Zabari

Decl., Ex. A; Ex. B)  "Where the prior interest is recorded, a legal presumption arises that the

purchaser had constructive notice, and the presumption cannot be rebutted . . . Where a purchaser

has knowledge of any fact, sufficient to put him on inquiry as to the existence of some right or

title in conflict with what he is about to purchase, he is presumed either to have made the inquiry

and ascertained the extent of such prior right, or to have been guilty of a degree of negligence

---

[6] RPAPL § 290(3) provides:

> The term 'conveyance' includes every written instrument, by which any estate
> or interest in real property is created, transferred, mortgaged or assigned, or by
> which the title to any real property may be affected, including an instrument in
> execution of a power, although the power be one of revocation only, and an
> instrument postponing or subordinating a mortgage lien; except a will, a lease
> for a term not exceeding three years, an executory contract for the sale or
> purchase of lands, and an instrument containing a power to convey real
> property as the agent or attorney for the owner of such property.

equally fatal to his claim to be considered a BFP." *Herman v. 36 Gramercy Pk. Realty Assoc., LLC*, 2017 N.Y. Misc. LEXIS 1536, at *39 (Sup. Ct. N.Y. Co. Apr. 21, 2017) (citation omitted).

Second, under the Purchase and Sale Agreement for 60G's Acquisition, 60G assumed the Lease, as well as responsibility for the State Court Litigation against Prince. (Fogel Decl., Ex. K, e.g., sections. 1.1, 3.2, 4.3, 71(i), 7.2(a), 7.2(c), 7.2(d), 7.3(a)) 60G also assumed responsibility for the State Court Litigation against Prince in a promissory note it signed in favor of its lender (the "Lender") for 60G's Acquisition. (Fogel Decl., Ex. P, Schedule 2 Covenants, Section C.5) Thus, there also is no dispute that 60G had actual knowledge of the Lease and the Assignment. Indeed, as this Court (Judge Drain) recognized when it denied 60G's motion to dismiss the recharacterization claim in the Amended Complaint, even if the Lease and Assignment were not recorded, given "the relatively simple documentation" and "the sophistication of 60G," review of those documents "would have put 60G on further inquir[y] notice regarding the potential recharacterization of the lease." (Fogel Decl. Ex. F at p. 17:9-17.) 60G's inquiry notice obligations are further underscored by the fact that Prince was in actual possession of the property. *See Nethaway v. Bosch,* 199 A.D.2d 654, 655 (3d Dep't 1993) ("The general rule is that actual possession of real estate is notice to all the world of the existence of any right which the person in possession is able to establish"); *1426 46 St., LLC v. Klein,* 60 A.D.3d 740, 743 (2d Dept. 2009).

60G undeniably had knowledge of the facts putting it on inquiry notice that the Lease could be recharacterized and the record is devoid of 60G making any such inquiry. Thus, 60G clearly fails to satisfy the "notice" element of BFP status and made 60G's Acquisition at its own risk. While this conclusion is warranted whether 60G failed to recognize the risks posed by the facts at that time, or recognized the risks and chose to proceed anyway, the heavily discounted

19

purchase price it paid for 60G's Acquisition and its subsequent resolution of the Foreclosure
Action with the Lender are strong evidence that it fully recognized the risks and made a
calculated business decision to proceed at its own peril.

As noted above, according to 60G, as of July 2016, the fair market value of the rent for
Prince's Space was at least $205,495.33 per month, or $2,465,943.96. (Fogel Decl., Ex. Q par.
10.) A reasonable assumption can be made that a market value purchase price for Prince's Space
would be based on some multiple of that annual income stream. Yet the NYC Transfer Tax
Report for 60G's Acquisition shows that 60G's purchase price in May 2015 was only $778,179,
less than 4 months' rent at market value. (Fogel Decl., Ex. O.) This vast discrepancy between a
reasonable market price and the actual purchase price for 60G's Acquisition supports the
conclusion that 60G's price was substantially discounted because it reflected the risks 60G was
knowingly taking. The known risks to 60G's Acquisition posed by the Lease and the Assignment
also explain why the application 542 Holding filed with the NYS Attorney General's Office to
convert Prince's Space to a commercial condominium and sell it to 60G omitted any mention of
the Lease, the Assignment and Prince (Zabari Decl., Ex. L), even though 542 Holding and its
representatives swore that the application did not contain any material omissions. (Id.)
Likewise, the Foreclosure Action by 60G's Lender and its resolution (Zabari Decl., Ex. S; Ex. T)
is also strong evidence that 60G fully recognized the risks and made a calculated business
decision to proceed at its own peril.

60G also fails to satisfy the "for value" element of BFP status. While a BFP status is not
required to pay fair market consideration, it is nonetheless required to act in good faith.
Especially given its sophistication, 60G did not act in good faith because it knowingly acquired
Prince's Space for a purchase price that was heavily discounted below fair market value to reflect

the inherent risks of the transaction posed by the facts, then tried to circumvent the facts to eliminate those risks and obtain a huge windfall at Prince's expense.

For all these reasons, 60G cannot maintain the status of a *bona fide* purchaser for value.

## CONCLUSION

For the foregoing reasons, Prince's motion should be granted and Prince should be awarded summary judgment in favor of Prince and against Defendants 542 Holding and 60G, as follows: (a) granting Prince summary judgment on Phase I of its claim for recharacterization of the Lease (Count I in the Amended Complaint); (b) dismissing 60G's affirmative defenses that it was a *bona fide* purchaser for value in 60G's Acquisition (First, Second and Third Affirmative Defenses in 60G's Answer to the Amended Complaint); and (c) scheduling additional proceedings for Phase II to determine the damages and other relief to which Prince is entitled.

Dated: New York, New York
      March 11, 2024

**LOUIS FOGEL & ASSOCIATES**

By: _____
     Louis Fogel
     LouisFogel@LouisFogellaw.com

     5 Nottingham Road
     Annandale, New Jersey  08801
     (908) 730-7692

     200 Water Street, Suite 1403
     New York, New York 10038
     (212) 944-1580

     *Attorney for Plaintiff Prince Fashions, Inc.*