UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF NEW YORK
_____x

In re:                                                      Chapter 11

Prince Fashions, Inc.,                                      Case No. 19-23079(LGB)

                 Debtor.
_____x
Prince Fashions, Inc.,

                 Plaintiff,            Adv. Pro. No. 19-08714 (LGB)

    -against-

60G 542 Broadway Owner, LLC and
542 Holding Corp.,

                 Defendants.
_____x


**DEBTOR/PLAINTIFF PRINCE FASHIONS, INC.'S
MEMORANDUM OF LAW IN OPPOSITION TO
DEFENDANT 60G 542 BROADWAY OWNER,
LLC'S MOTION FOR SUMMARY JUDGMENT**


**LOUIS FOGEL & ASSOCIATES**
Louis Fogel
LouisFogel@LouisFogellaw.com

5 Nottingham Road
Annandale, New Jersey  08801
(908) 730-7692

200 Water Street, Suite 1403
New York, New York 10038
(212) 944-1580

*Attorney for Plaintiff Prince
Fashions, Inc.*

# Table Of Contents

Table of Authorities                                                                    -ii-

PRELIMINARY STATEMENT                                                    1

ARGUMENT

Point I      60G's Motion For Summary Judgment Dismissing The              5
             Recharacterization Claim On The Basis That The Lease
             Is A True Lease Should Be Denied, Because The Lease
             Terms, As Well As The Larger Transaction Of Which +
             The Lease Was A Part, Demonstrate That The Economic
             Substance Of The Transaction Is Not A True Lease And
             Was Intended To Convey An Ownership Interest

Point II     60G's Motion For Summary Judgment Dismissing             15
             The Recharacterization Claim On The Grounds
             That It Is Barred By The State Court's Termination
             Of The Lease And That This Court Lacks Subject
             Matter Jurisdiction Under Rooker-Feldman Should
             Be Denied, Because This Court Previously Rejected
             Those Same Exact Arguments When It Denied 60G's
             Motions To Dismiss The  Recharacterization Claim
             In The Complaint And The Amended Complaint

A.           Termination Of The Lease                                          15

B.           Rooker-Feldman                                                       19

Point III    60G's Motion For Summary Judgment                        23
             On Its Affirmative Defenses That It Was
             A Bona Fide Purchaser Should Be Denied,
             Because There Is No Dispute That 60G
             Had Actual Knowledge Of The Recorded
             Lease And Assignment When It Purchased
             Prince's Space, Putting It On Inquiry Notice
             That The Lease Could Be Recharacterized

CONCLUSION                                                                       30

**<u>Table Of Authorities</u>**

**Cases**

*436 Franklin Realty, LLC v. U.S. Bank N.A.*, 188 A.D.3d 960
(2d Dep't 2020)                                                                          24

*930 Fifth Ave. Corp. v. Shearman*, 17 Misc. 3d 1126, *affirmed,*
885 N.Y.S. 2d 712 (1st Dep't. 2009)                                            17

*1426 46 St., LLC v. Klein*, 60 A.D.3d 740, 876 N.Y.S.2d 425
(2nd Dept. 2009)                                                                        26

*Akasa Holdings, LLC v. 214 Lafayette House, LLC*,
177 A.D.3d 103 (1st Dep't 2019)                                               24

*Andy Assoc., Inc. v Bankers Tr. Co.*, 49 N.Y.2d 13 (1979)            28

*Barney's, Inc. v. Isetan Co. (In re Barney's, Inc.)*,
206 B.R. 328 (Bankr.S.D.N.Y.1997)                                          6, 22

*Bossbrinck v. Accredited 4 Home Lenders, Inc.*,
773 F.3d 423, 427 (2d Cir. 2005)                                             22

*Broich v. Incorporated Village of South 7 Hampton*, 462 Fed.
Appx. 3926 (2d Cir. 2012)                                                        18

*Central Hudson Gas & Electric 5 Corp. v. Empresa Naviera Santa
S.A.*, 56 F.3d 359, 368 (2d Cir. 6 1995)                                       18

*City Bank of Bayonne v. Hocke*, 168 A.D. 83, 153 N.Y.S. 731
1st Dept. 1915)                                                                          26

*D.C. Court of Appeals v. Feldman*, 460 U.S. 426 (1983)            20, 23

*Doyle v. Lazarro,* 33 A.D.2d 142, 306 N.Y.S.2d 268 (2nd Dep't 1970),
aff'd, 33 N.Y.2d 981, 353 N.Y.S.2d 740, 309 N.E.2d 138 (1974)            26

*Exxon Mobile v. Saudi Basic Industries 18 Corp.*,
544 U.S. 280 (2005)                                                                 20, 21

*Fekishazy v. Thomson*, 204 A.D.2d 959, 960 (3d Dept 1994)            29

*Fischer v Sadov Realty Corp.*, 34 AD3d 630, 824 NYS2d 434
(2nd Dept. 2006)                                                                      29

*Gregg v. M & T Bank Corp.*, 160 AD3d 936 (2d Dept 2018)  25

*Henry Modell and Co. v. 11 Ministers*, 58 N.Y. 2d 456 (1986)  17, 18

*Hense v. Martin*, 417 Fed. Appx. 83, 83-84 (2d Cir. 2011)  21

*In re Chateaugay Corp.*, 102 B.R. 335 (Bankr. S.D.N.Y. 1989)  13

*In re Elder Care LLP v. Dupuis, In re Elder Care LLC.*, 503
Fed. Appx., n.1 (2d 20 Cir. Nov. 15, 2012)  22

*In re Hardway Restaurant, Inc.,* 31 B.R. 322 (Bankr. S.D.N.Y. 1983)  26

*In Re Hotel Syracuse v. City of Syracuse Industrial
Development Agency,* 155 B.R. 824 (USBC SDNY 1993)  5, 7, 11, 16, 21

*In re KAR Dev. Assocs., L.P.,* 180 B.R. 629 (D.Kan.1995)  6-7

*In re Keydata Corp.,* 18 B.R. 907 (Bankr.D.Mass.1982)  6

*In Re Lefrak v. Lefrak*, 223 B.R. 431 (USBC SDNY 1998)  5, 6, 7, 9, 22

*In re Mirant Corp.*, 2005 Bankr. LEXIS 2309 *20 (Bankr.
N.D. Texas Nov. 14 22, 2005)  22

*In re Moreggia & Sons, Inc.,* 852 F.2d 1179 (9th Cir. 1988)  6, 27

*In re PCH Associates v. PCH Associates,* 804 F.2d 193
(2d. Cir. 1986)  5, 6, 7, 8, 9, 11, 13,
17, 22, 27

In Re PCH Associates, 949 F.2d 585 (2d Cir. 1991)  23

*In Re TAK Broadcasting Corp.*, 37 B.R. 728 (USBC WD
Wisc. 1992)  11, 12

*International Trade Administration v. Rensselaer Polytechnic
Inst.,* 936 F.2d 744 (2d. Cir. 1994)  5, 6, 7, 8, 11, 22, 27

*LaSalle Bank Natl. Assn. v Ally,* 39 AD3d 597, 835 NYS2d 264
(2nd Dept. 2007)  25

*Maiorano v Garson,* 65 AD3d 1300, 886 NYS2d 190
(2nd Dept. 2009)                                                              25

*Marinelli Associates v. Helmsley-Noyes Co.*, 265 A.D. 2d 1 (2000)    16

*Nath v. National Equipment Leasing Corp.,* 282 Pa.Super.
142, 422 A.2d 868 (1980), *aff'd,* 497 Pa. 126, 439 A.2d 633 (1981)    6, 13

*O'Brien v. City of Syracuse*, 54 N.Y. 2d 353 (1981)                  16

*Phelan v. Brady*, 119 N.Y. 587, 23 N.E. 1109 (1890)                  26

*Phifer v. City of New York*, 12 289 F.3d 49 (2d Cir. 2002)          21

*Rooker v. Fidelity Trust Co*, 263 U.S. 413 (1923)          2, 19, 20, 21, 23

*Stoneybrook Realty, L.L.C. v. Cremktco Inc.*, 176 Misc.2d 589
(App Term, 2d Dept 1998)                                              29

*Stracham v Bresnick*, 76 A.D.3d 1009, 908 N.Y.S.2d 95,
2010 N.Y. App. Div. LEXIS 6767 (2010)                                25

*Sun Oil Co. v. Commissioner*, 562 F2d 258, 263 (3d Cir. 1977)       5

*Ward v. Ward*, 52 A.D.3d 919, 859 N.Y.S.2d 774 (3rd Dept. 2008)     26

*Williamson v Brown,* 15 NY 354 (1857)                               26

Debtor/Plaintiff Prince Fashions, Inc. ("Prince"), by its undersigned counsel, respectfully submits this Memorandum of Law in opposition to defendant 60G's motion pursuant to Rule 56 of the Federal Rules of Civil Procedure for summary judgment: (a) dismissing Prince's claim for recharacterization of the Lease;[1] and (b) granting 60G summary judgment on its affirmative defenses that it was a *bona fide* purchaser for value of Prince's Space when it made 60G's Acquisition with knowledge of the Lease.

## PRELIMINARY STATEMENT

Prince's motion for summary judgment amply demonstrates that there is abundant evidence in the record to support Prince's claim for recharacterization of the Lease under the economic substance test, and 60G's motion to dismiss the recharacterization claim should be denied for the same reasons.  60G's motion ignores the supporting evidence -- including salient Lease terms and the transactions of which the Lease was a part -- and pretends there is none, calling Prince's claim  a "charade."  However, what 60G calls a charade is Prince's "life and death" struggle to fight back against defendants' years-long campaign to wrongfully deprive Prince of the very substantial economic value of its only business asset.  If anything, the charade lies in 60G's baseless attempts to avoid responsibility.  Apparently, since 60G has no valid arguments, its strategy is to denigrate Prince's claim loudly, brusquely and often in the hope it may start to ring true.  But the Court should not be fooled by 60G's tactic of name-calling and "pounding the table" as a means of diverting attention from the lack of merit to its motion on a factual and legal basis.  The evidence compels the conclusion that 60G's motion to dismiss the recharacterization claim on the merits should be denied under the economic substance test.

---

[1] Capitalized terms not otherwise defined herein shall have the same meanings set forth in Prince's motion for summary judgment.

1

60G's misplaced attempt to explain away the merits of Prince's claim completely misses the mark.

Since 60G has only failing arguments on the merits of Prince's claim, its motion desperately seeks to avoid having the Court entertain the merits by recycling two (2) other baseless arguments for dismissal that have already been rejected by this Court -- that Prince's claim is barred by the State Court's termination of the Lease, and that this Court lacks subject matter jurisdiction of the claim under *Rooker-Feldman*. However, this Court previously rejected those same exact arguments when it denied 60G's motions to dismiss the recharacterization claim in the Complaint and the Amended Complaint on those same exact grounds. This Court's prior rulings preclude 60G from re-litigating those issues on this motion and likewise compel denial of 60G's motion for summary judgment dismissing the recharacterization claim.

The second branch of 60G's motion, which seeks summary judgment on its affirmative defenses that it is a bona fide purchaser ("BFP"), should also be denied because 60G is not a BFP as a matter of law. First, it is undisputed that prior to 60G's Acquisition, it had knowledge of facts putting it on inquiry notice that the Lease could be recharacterized. Among other things, the Lease and the Assignment were recorded in 1980, Prince or its sub-tenants were in continuous possession since that time, 60G had actual knowledge of the Lease and the Assignment, as well as the State Court Litigation seeking to terminate the Lease, and 60G assumed the Lease and responsibility for the State Court Litigation. These facts and others put 60G on inquiry notice that the Lease could be recharacterized, regardless of whether or not 60G recognized the risks posed by the facts at that time (although given 60G's sophistication, it likely recognized the risks and made the calculated business decision to accept them). Second, 60G lacks BFP status because it also fails to satisfy the element of acting in "good faith."

2

60G also makes the false and misguided claim that Prince never said it has an ownership interest prior to this proceeding, which would not help 60G. First, this Court previously rejected the significance of 60G's claim when it held that Prince's ownership was not an issue in the State Court Litigation (where the issue was whether 542 Holding or 60G was the landlord with standing to seek enforcement of the Lease as a lease) and that the recharacterization claim was not barred by collateral estoppel or res judicata because that determination is a matter of federal law and was not and could not have been litigated in State Court.

Second, this Court also previously rejected 60G's argument that the recharacterization claim is barred by judicial estoppel based on defenses Prince asserted as a tenant in the State Court Litigation. (See July 14, 2020 Transcript of Hearing (the "July 14, 2020 Hearing") on Motion to Dismiss Complaint ("July 14, 2020 Transcript"), 40:13-14 – 42 :8-9.) A true copy of the July 14, 2020 Transcript is annexed to the March 11, 2024 Declaration of Louis Fogel, Esq. in support of Prince's motion for summary judgment (the "Fogel Decl.") as Exhibit D.) [2] By making this same misguided argument here absent the labels it used before (*i.e.*, collateral estoppel, res judicata, judicial estoppel), 60G is merely restating baseless arguments that have already been rejected in an ill-disguised attempt to make an end-run around this Court's prior rulings.

Third, in any event, 60G's claim that Prince never said it has an ownership interest is false. Even though it was not an issue in that case, Prince did state that its interest was equivalent to ownership in a submission it made in a New York County Supreme Court action filed against 542 Holding in 1996 (Index No. 110089/96) (the "1996 Action") concerning 542

---

[2] Exhibits A-T referenced herein are exhibits Prince submitted in support of its motion for summary judgment. They are attached to Prince's supporting Declarations and are incorporated herein in full.

Holding's attempts to interfere with work in Prince's Space: "Given plaintiffs' 200-year lease,

plaintiffs' interests in the Premises is that of an owner of the space rather than a tenant." (See the

Affidavit of Doron Zabari in the 1996 Action sworn to on June 4, 1996 ("DZ 1996 Aff."), par. 3.

A true copy of the DZ 1996 Aff. is annexed to the Declaration of Doron Zabari dated April 10,

2024 in opposition to 60G's motion ("Zabari Opp. Decl.") as Exhibit U.) While the absence of

that claim by Prince would be insignificant since it was not an issue in the 1996 Action, Prince

having made the claim, it is highly significant that defendant 542 Holding told the Court it

agreed: "Certainly Prince has acknowledged it has an interest in the premises akin to an

ownership interest. A leasehold for 199 years would seem to support this contention." (See the

Affidavit of Bennet Averyt, 542 Holdings' treasurer, in the 1996 Action, sworn to on December

8, 1997 ("Averyt 1997 Aff."), par. 42). A true copy of the Averyt 1997 Aff. is annexed to the

Zabari Opp. Decl. as Exhibit V.) 542 Holding reiterated its agreement multiple times : (1)

"Plaintiffs [including Prince] acknowledge that their interest under the Lease is equivalent to an

ownership interest. Indeed, defendant does not dispute this claim." (See 542 Holding's

Memorandum Of Law dated June 20, 1996 in the 1996 Action ("542 Holding's 1996 MOL"), p.

5. A true copy of 542 Holding's 1996 MOL is annexed to the Zabari Opp. Decl. as Exhibit W.);

(2) "Plaintiffs [including Prince] assert a claim to an ownership interest in the south store and

basement for 199 years under the Lease. Effectively, the original sweetheart lease [i.e., the

Lease] is tantamount to a proprietary interest in the south store." (Id., p. 10.); (3) "The lease in

question is not typical of standard commercial leases." (Id., p. 21); (4) Defendant [542 Holding]

may avail itself of the business judgment rule and regulate Plaintiffs' conduct because Plaintiff

Prince's 199-year lease effectively grants Plaintiffs an ownership interest in the premises similar

to that of shareholders….As such, they are bound by the same rules as other proprietary lessees

4

in the building and are subject to the business judgment rule." (See 542 Holding's Memorandum

Of Law dated August 22, 2000 in the 1996 Action ("542 Holding's 2000 MOL"), p. 3. A true

copy of 542 Holding's 2000 MOL is annexed to the Declaration of Doron Zabari dated April 10,

2024 as Exhibit X.) These fatal admissions by 542 Holding, 60G's transferor, are binding on 60G

and further warrant denial of both branches of 60G's motion for summary judgment.

### ARGUMENT

**Point I**          **60G's Motion For Summary Judgment Dismissing The Recharacterization Claim On The Basis That The Lease Is A True Lease Should Be Denied, Because The Lease Terms, As Well As The Larger Transaction Of Which The Lease Was A Part, Demonstrate That The Economic Substance Of The Transaction Is Not A True Lease And Was Intended To Convey An Ownership Interest**

Recharacterization of a lease is warranted under the economic substance test where, as

here, "the parties intended to impose obligations and confer rights significantly different from

those arising from the ordinary landlord/tenant relationship.[3] " *International Trade*

*Administration v. Rensselaer Polytechnic Inst.,* 936 F.2d 744, 748 (2d. Cir. 1994) (quoting *In re*

*PCH Associates v. PCH Associates,* 804 F.2d 193, 200 (2d. Cir. 1986). In making this

determination, a court looks "to the economic realities of the lease and not to the labels applied

by the parties" to determine the true nature of a transaction." *In re PCH Associates, supra,* 804

F.2d 193 at 200 (quoting *Sun Oil Co. v. Commissioner*, 562 F2d 258, 263 (3d Cir. 1977). See

also *In Re Hotel Syracuse v. City of Syracuse Industrial Development Agency,* 155 B.R. 824, 838

(USBC SDNY 1993) (holding that titling a document as a lease which described itself as  a

---

[3] Unlike the Lease here, the usual landlord-tenant relationship involves (among other things), a landlord acquiring a property for its own benefit and then renting it at a profit under a relatively short lease term, under which a tenant does not pay the operating costs typically associated with ownership and does not "face the risks or enjoy the rewards of fluctuating values in the real property market… or acquire an asset that it can pledge or sell…" *In Re Lefrak v. Lefrak*, 223 B.R. 431, 435 (USBC SDNY 1998).

"rental agreement to use real property" does not establish that it was a "true lease" under

Bankruptcy Code § 365(d)(4)) (citing *In re PCH Associates, supra,* 804 F.2d at 199).  *See also*

*Nath v. National Equipment Leasing Corp.,* 282 Pa.Super. 142, 153 n. 8, 422 A.2d 868, 873 n. 8

(1980), *aff'd,* 497 Pa. 126, 439 A.2d 633 (1981); *In re Keydata Corp.,* 18 B.R. 907, 909

(Bankr.D.Mass.1982)."

Rather than relying on form, "the court must look to the economic substance of the

transaction" to determine whether it is in fact a "true" lease. *See International Trade*

*Administration, supra,* 936 F.2d at 748.  "The bankruptcy court is to look to the circumstances

of the case and consider the economic substance of the transaction rather than "the locus of title,

the form of the transaction or the fact that the transaction is denominated as a 'lease,' " to

determine whether the transaction embodies a "true lease…" *In re PCH Associates, supra,* 804

F.2d at 199 (citing S.Rep. No. 989, 95th Cong., 2d Sess. 64, *reprinted in* 1978 U.S.Code Cong.

& Ad. News 5787, 5850)

"Moreover, while state law determines whether an agreement is a lease, merely meeting

the state definition of a lease does not mandate the unthinking application of § 365(d)(4)." *In re*

*Moreggia & Sons, Inc.,* 852 F.2d 1179, 182-83  (9th Cir. 1988). "It is well-settled that section 365

applies only to "true" or "bona fide" leases (citing *International Trade Admin., supra,*  936 F.2d

at 748;  *In re PCH Assocs., supra,* 804 F.2d at 198–99) and its applicability presents a question

of federal law."  *In Re LeFrak v. LeFrak,* 223 B.R. 431, 434 (USBC SDNY 1998) (citing

*Barney's, Inc. v. Isetan Co. (In re Barney's, Inc.),* 206 B.R. 328, 332 (Bankr.S.D.N.Y.1997).

Thus, while state law may treat the agreement as a lease, this does not mandate the application of

section 365.  *In re Moreggia & Sons, supra,* 852 F.2d at 1182–83 (9th Cir.1988); *In re KAR Dev.*

*Assocs., L.P.,* 180 B.R. 629, 638–39 (D.Kan.1995); *Hotel Syracuse, Inc. v. City of Syracuse Indus. Dev. Agency (In re Hotel Syracuse, Inc.*), 155 B.R. 824, 838 (Bankr.N.D.N.Y.1993).

      Application of the economic substance test to the Lease here dictates the conclusion that it is "intended to impose obligations and/or confer rights significantly different from those arising from the ordinary landlord/tenant relationship" and should be recharacterized as a sale on that basis.

      A primary factor in the analysis is whether the "rent" is calculated to compensate and profit the lessor for the fair market use of the space, or for some other purpose. A finding that the "rent" is structured for some other purpose supports a conclusion that a transaction is not a true lease. See *In Re Hotel Syracuse, supra,* 155 B.R. 824, 840 (holding that a lease in which the "rental" payments were not structured to compensate the lessor for the fair market use of the land was not a true lease): "The primary difference is the nature of the rental payments which were structured primarily for the purpose of amortizing the amount due on the outstanding bonds, rather than, as would characterize a normal lease, to assure payment of a profit to [the lessor] stemming from the Debtor's use and occupation of the Hotels." (citing *International Trade Administration*, *supra,* 936 F.2d at 751). See also, *In Re Lefrak*, supra, 223 B.R. 431, 435, (USBC SDNY 1998) (holding that a lease was not a true lease where the "rent" did not reflect compensation for the use of the property and was structured for another purpose, *i.e.*, to cover the lessee's *pro rata* share of the landlord's building expenses, without regard to profit, so as to pass through to the tenants the landlord's operating expenses for the building). See also *In Re PCH, supra*, 804 F2d at 200-01 (holding that a lease was not a true lease where "the rent was not calculated to compensate [the lessor] for the use of the property; rather the parties structured the "rent" solely to ensure [the lessor's] return on its investment.")

7

Here, the "rent" under the Lease is clearly not calculated to compensate and profit the lessor for the fair market use of Prince's Space. Rather, it is permanently fixed at "19.99% of the net expenses of the building" each year for the entire term of the Lease. (Zabari Decl., Ex.A, p.1) This is clearly designed for the obvious purpose of passing through to the lessee the agreed percentage of the Building's expenses attributable to Prince's Space - without regard to profit. Moreover, it is undisputed that the "rent" under the Lease is substantially below market for Prince's Space and is structured to provide the right to derive all profits for the fair market use of Prince's Space to the lessee. According to 60G, as of October 2017, Prince was paying 60G "a mere $2,000 per month for over 3,400 square feet of prime retail space in the heart of the SoHo retail corridor while Prince is collecting tens of thousands of dollars every month from its commercial subtenants" [for Prince's Space]." (Fogel Decl. Ex. Q, par. 3.) Also according to 60G, as of July 2016, the fair market value of the rent for Prince's Space was at least 205,495.33 per month. (Id., par. 10.) These key facts showing that the "rent" is not structured to profit the lessor strongly support a finding that the Lease is not a true lease and should be recharacterized as a sale.

An unusually long term also supports a finding that a lease is not a true lease. *In Re Lefrak, supra*, 223 B.R. 431 (holding that a lease with a term of 98 years was not a true lease); *International Trade Administration, supra* 936 F.2d 744 (holding that a lease with a term of 99 years was not a true lease); *In re PCH Associates, supra,* 804 F.2d 193 (holding that a lease with a term of 165 years was not a true lease). Here, the Lease has an initial term of 99 years (Zabari Decl., Ex. A, par. 1) and also grants the lessee Options to extend the Lease for an additional 100 years (Id., par. 47), for a total term of 199 years. Tellingly, the lessee's right to extend the Lease for an additional 100 years is on the same terms. (Id.) Also significantly, lessee did not have to

8

pay any additional fee or other consideration (not even a nominal sum) to obtain the Options, and

no additional fee or other consideration (not even a nominal sum) is payable by the lessee to

exercise the Options.  These key facts showing that the Lease term is unusually long and can be

extended for further unusually long extensions, and at no cost and on the same terms no less,

especially in combination with the other factors also present here, further demonstrate that the

Lease confers rights significantly different from those arising from the ordinary landlord/tenant

relationship and should be recharacterized.

The lessee's assumption of expenses usually associated with ownership, including taxes,

insurance and maintenance,[4] is an additional fact further supporting recharacterization of the

Lease.  *See In re PCH Associates, supra,* 804 F.2d at 200–01 (citations omitted)."  See also *In re*

*Lefrak v. Lefrak*, 223 BR 431 (1998).   As noted above, here the "rent" under the Lease is

"19.99% of the net expenses of the building…as defined in paragraph 43," representing the

agreed percentage of the Building expenses attributable to Prince's Space.  (Zabari Decl., Ex. A,

par. 1.)  In relevant part, paragraph 43 of the Lease says "[n]et expenses are accrued expenses

related to the operation of the building for a calendar year…"  This includes taxes and insurance,

among other expenses.  (Zabari Decl., Ex. A, par. 43.)  The definition of "Net expenses" in

paragraph 43 also expressly includes repairs and maintenance.  (Id.) Pursuant to these provisions,

the lessee is responsible for paying its agreed 19.99% of the ownership expenses attributable to

Prince's Space.  In this manner, the "rent" is essentially equivalent to the monthly maintenance

---

[4] "As noted in the *Senate Report* on section 502(b)(6) of the Bankruptcy Code:  [T]he fact that
the lessee assumes and discharges substantially all the risks and obligations ordinarily attributed
to the outright ownership of the property is more indicative of a financing transaction than of a
true lease. The rental payments in such cases are in substance payments of principal and interest
either on a loan secured by the leased real property or on the purchase of the leased real
property." In Re PCH I, 804 F2d 193 804 F.2d 193 (1986). (citations omitted)

fee the Building collects under a proprietary lease from each residential cooperative apartment for its agreed share of the Building expenses.  Moreover, the Lease also provides that 542 Holding will provide Prince an accounting of the net expenses to show the rent due and that "all monies paid to the Landlord in excess of the actual rent due must be returned to the Tenant within 30 days after receipt by the Tenant from the Landlord of an accounting of said expenses." (Zabari Decl, Ex. A, par. 43.A.)  These facts showing that Prince pays expenses usually associated with ownership also strongly support the conclusion that the Lease is not a true lease and should be recharacterized as a sale.

While the foregoing facts warrant recharacterization, the Lease contains still further indicia of ownership.  First, the Lease confers on the lessee the right to use Prince's Space "for any lawful purpose."  (Zabari Decl., Ex. A, p.1)  Second, the Lease confers on the lessee the valuable rights to sublease, assign, mortgage and encumber the Lease and Prince's Space. (Zabari Decl., Ex. A, par. 47.)  Third, the lessee has the unfettered freedom to exercise those typical ownership rights without the lessor's consent.  (Id.)  Fourth, all such ownership rights are also conferred on the lessee's "heirs, distributees, executors, administrators, legal representatives, successors and assigns."  Fifth, the lessee's heirs, distributees, executors, administrators, legal representatives, successors and assigns also have the unfettered freedom to exercise those typical ownership rights without the lessor's consent.  (Id.)  Sixth, the Lease does not require Prince to comply with 542 Holding's Rules and Regulations.  (Zabari Decl., Ex. A, par. 35, Acknowledgements page.)  These terms further add to the bundle of ownership rights evident in the Lease which, in combination, amply demonstrate that the economic substance of

the Lease is not a true lease because it is significantly different from those arising from the

ordinary landlord/tenant relationship.[5]

The larger transaction of which the Lease was a part provides additional evidence that the

Lease is not a "true lease," to wit: immediately prior to the Lease, 542 Equities was the owner of

the Property and transferred it to 542 Holding, which immediately Leased it back to 542

Equities, which then promptly assigned the Lease to Prince; the transfer by 542 Equities (which

acted through David Silverstein) to 542 Holding (which also acted through David Silverstein)

and the Lease back to 542 Equities and assignment to Prince were done in connection with

conversion of the Building to a cooperative housing corporation by 542 Equities, as the sponsor,

effectively enabling it to monetize the entire Building through the sale of all of the units.  (See

Exhibits A, B, I,  J, and L to the Declaration of Louis Fogel, Esq. dated March 11, 2024 in

support of Prince's motion for summary judgment and Exhibit R to the Zabari Decl.)  Given the

sale and Lease back between 542 Equities and 542 Holding, it is not surprising that the Lease

gives 542 Equities, as lessee, all these indicia of ownership.[6]  See *In Re PCH Associates, supra*,

804 F.2d 193 (holding that a sale/leaseback was not a true lease).  See also, *In Re Hotel*

*Syracuse, supra*, 155 B.R. 824 (holding that lessor's acquisition of property for lessee's use

supports finding that lease was not a true lease.)  See also *In Re TAK Broadcasting Corp.*, 37

---

[5] Especially where, as here, there is ample evidence the Lease is not a true lease, the fact that a lessor may retain a certain degree of control over the property does not alter the conclusion.  *See International Trade Admin. v. RPI,*  936 F2d 744 (2d Cir. 1991), which held that a lease was not a true lease notwithstanding the lessor's "continued exercise of a degree of control over the property, evident for example in its continued right to inspect the premises, or its right to approve assignments and improvements."

[6] In a Complaint 542 Holding filed in the State Court Litigation, it concedes that "[t]je Lease was not an arm's length impartial transaction between the Sponsor [542 Equities] and the Coop (542 Holding) , which was then controlled by the Sponsor.  The Sponsor drafted the Lease, caused the Coop to enter into the Lease with it, and then assigned the Lease to Prince."   (Zabari Decl., Ex. R, par. 5.)

B.R. 728 (USBC WD Wisc. 1992) (holding lease that was part of a larger transaction was not a true lease.)

Tellingly, because it supports Prince's claim, 60G's motion completely ignores all of the evidence concerning the transactions of which the Lease was a part. For the same reason, 60G also ignores most of the salient Lease terms or meekly attempts to explain them away by misrepresenting their meaning and/or significance. For example, 60G misrepresents that setting the "rent" as a percentage of the Building expenses fails to satisfy the economic substance test because it demonstrates that the rent is intended to compensate the lessor for the use of Prince's Space. 60G's argument is disingenuous, at best, because it conveniently omits the key factor in analyzing the rent -- whether it is intended to compensate and *profit the lessor* for the lessee's *fair market* use -- which the rent here clearly is not. Needless to say, 60G's quest to deprive Prince of the very substantial profits that the Lease is structured to provide Prince for fair market use over the course of 199 years and seize those profits for itself is the very reason the parties are here. 60G's omission of this key element should not succeed in misleading the Court.

Similarly misleading is 60G's claim that the Lease is not a triple net lease, under which a lessee typically leases 100% of a building and pays 100% of the operating costs, including taxes, insurance and maintenance. For one thing, the test is not whether the Lease is a triple net lease; it is whether it grants rights and/or imposes obligations normally associated with ownership, which the Lease certainly does (e.g., the rights to use Prince's Space for any lawful purpose for a total of 199 years and to sell, mortgage, encumber, etc. without lessor's consent; the obligations to pay rent in the exact amount of 19.99% of the Building's expenses, representing the agreed percentage of the expenses attributable to Prince's Space). Moreover, since the Lease is for a portion of the Building and the lessee pays the agreed share of all Building operating expenses,

including taxes, insurance and maintenance attributable to that portion, it effectively is a triple net lease for the lessee's portion of the Building in any event.

60G's reliance on the absence of a purchase option in the Lease is likewise misplaced, since a purchase option is unnecessary, and its so-called absence is negated by other terms that would render it of no practical significance. Thus, as this Court has already held: "Clearly, the lease itself is extraordinarily long; 99 years with options to renew for another 100 years. One could easily assume from that, in addition, that the property's use for (sic – should be useful) life would be subsumed within the duration of the lease, plus the extensions." (See July 14, 2020 Transcript, 42:17-21, Fogel Decl., Ex. D.) Since the useful life of the Property will end by the end of the Lease, there is no practical purpose of having a purchase option thereafter.

60G also mistakenly relies on section 20 of the Lease, which states that, "no rights, easements, or licenses are acquired by Tenant by implication or otherwise except as expressly set forth in the provisions of the Lease." (60G's Motion, Point II.B.) However, in PCH-1, the District Court expressly rejected the exact same argument advanced by the landlord: "the fact that § 3.01 of the Ground Lease contains a disclaimer that the parties intend the Ground Lease to be a lease and nothing else does not prevent an examination of the parties' intent in light of all of the surrounding circumstances." In re PCH Assocs., 55 B.R. 273, 280 (Bankr. S.D.N.Y. 1985), aff'd, 60 B.R. 870 (S.D.N.Y. 1986), aff'd, 804 F.2d 193 (2d Cir. 1986) (citing Nath v. Nat'l Equip. Leasing Corp., 282 Pa. Super. 142, 151, 422 A.2d 868, 873 (1980), aff'd, 497 Pa. 126, 439 A.2d 633 (1981)) (almost identical provision in an equipment lease did not prevent the court from considering the circumstances surrounding the agreement, including the negotiations that led to its execution, and concluding that the agreement was not a true lease); see also In re Chateaugay Corp., 102 B.R. 335, 343 (Bankr. S.D.N.Y. 1989) ("this Court must examine the intent of the

13

parties, the circumstances surrounding their negotiations, and the economic substance of the final

transaction. The mere form in which a particular transaction is cast is not controlling and thus,

this Court is not bound either by the parties' characterization of the transaction as a lease or by

the terminology (e.g., "rent", "lessee", "lessor") contained therein.").

The evidence supporting recharacterization clearly outweighs the few other Lease terms

60G has cherry-picked in the mistaken belief that they support its argument.  But they do not,[7] as

this Court ruled when it denied 60G's motion to dismiss the Amended Complaint on the basis of

those same terms: "However, given the other allegations of the complaint and the distinctly fact-

based nature of the inquiry, I conclude that each of those provisions [relied on by 60G] would not

be dispositive here. And I note that many of them are consistent with a co-op's rights to material

changes, and a co-op's rights if maintenance is not paid to enforce the co-op's obligation and lien

for such rights. Further, given the length of the term, the absence of a purchase option at nominal

consideration is not dispositive, particularly given the allegations as to Prince Fashions' business

and the small size of the leasehold." (September 3, 2021 Transcript of Hearing (the "September

3, 2021 Hearing") on Motion to Dismiss Amended Complaint, 24:21-25:16.)

---

[7] Nor do other red herrings 60G trumpets to no avail.  Thus, it is not relevant or surprising that Doron Zabari, Prince's principle, has no personal knowledge of the events that occurred prior to 1995, when he first became associated with Prince, including records to prove Prince paid $40,000 to 542 Equities more than 40 years ago as set forth in the security agreement or that the $40,000 reflected fair market value at that time, none of which is critical to Prince's claim.  His personal knowledge is not required and the record evidence bears out the essence of the Amended Complaint (e.g., since there was a $200,000 mortgage covering the entire Building in 1980 (Fogel Decl., Ex. J) and the Lease reflects that 19.99% of the Building is the agreed portion attributable to Prince's Space, it is logical to conclude that 20% of the $200,000 mortgage value, or $40,000, is the approximate value attributable to Prince's Space).  Moreover, if the issue of Prince's payment of the $40,000 was relevant, 60G would have no standing to raise it, and 542 Equities, the only one with standing, does not claim that the Assignment is not and has not been in full force and effect since 1980 (and the statute of limitations on any such claim would have expired decades ago).  It would also be ludicrous for defendants to argue that the Assignment of the Lease to Prince is not in full force and effect due to non-payment more than 40 years ago, since they have been collecting rent from Prince since 1980 and spent years trying to terminate Prince's Lease.

14

The foregoing demonstrates that the record clearly favors recharacterization and that 60G's motion for summary judgment dismissing Prince's recharacterization claim should be denied.

**Point II**          **60G's Motion For Summary Judgment Dismissing The Recharacterization Claim On The Grounds That It Is Barred By The State Court's Termination Of The Lease And That This Court Lacks Subject Matter Jurisdiction Under Rooker-Feldman Should Be Denied, Because This Court Previously Rejected Those Same Exact Arguments When It Denied 60G's Motions To Dismiss The Recharacterization Claim In The Complaint And The Amended Complaint On Those Same Grounds**

Since 60G has only failing arguments on the lack of merit of Prince's recharacterization claim, its motion desperately seeks to avoid having the Court entertain Prince's claim on the merits by recycling two (2) other baseless arguments for dismissal that have already been rejected by this Court. The Court's prior rulings preclude 60G from re-litigating these issues on this motion and likewise warrant denial of the motion.

### A.      Termination Of The Lease

First, 60G argues that this Court cannot entertain the recharacterization claim because the Lease was terminated by the New York State Court. (60G's Motion, Argument, Point III.) According to 60G, that entitles it to summary judgment because: "It is well-settled in New York that once terminated, a lease cannot be revived." (Id., p.19) Incredibly, 60G completely ignores that it previously made this same exact argument unsuccessfully on its motion to dismiss the Complaint: "the leasehold interest now has been terminated, and the Court lacks the power to revive a terminated lease." (See July 14, 2020 Hearing, 6:5-7, Fogel Decl., Ex.  (quoting 60G's counsel, Mr. Eichel.) A true copy of the July 14, 2020 Transcript is annexed to the Declaration of

15

Louis Fogel, Esq. dated April 10, 2024 as Exhibit D.)    The Court correctly rejected it at that

time, and 60G is bound by the Court's prior ruling.  As the Court stated:

> THE COURT: I didn't follow that argument. (July 14, 2020 Transcript, 6:11.)
>
> THE COURT: Let me explain to you why I didn't follow it. The complaint
> doesn't seek to revive the lease, it seeks a determination that the Debtor
> transferred or has an ownership interest in the property…. (Id., 6:13-16.)

Undeterred, 60G tried to explain its faulty reasoning:

> MR. EICHEL: But, Your Honor, if there is no lease or whatever you want to call
> the document and it's been terminated, then there's nothing, from our perspective,
> Your Honor, that they can now say exists. You can't revive something if an
> agreement is gone, if it's terminated. So, that's our position, Your Honor. Unlike
> the other cases, Your Honor, all the cases cited by Prince's counsel and by us, in
> none of the cases, do they say, the lease was terminated and yet, we're still going
> to recharacterize; we're still going to do something because we can. In all those
> cases, the lease, or the document, whatever you want to call it, was still in
> existence. Here, our position is, that the lease has been terminated, or the
> document, which gave them rights, has been terminated, and it no longer can be
> revived, and therefore, they no longer can have an ownership interest. That's the
> point, Your Honor.  (Id., 6:20-7:9.)

The Court was still not buying it:

> THE COURT: All right. It doesn't make sense.  (Id., 7:10.)

Later in the July 14, 2020 Hearing, the Court explained in detail why 60G's argument

that termination of the Lease by the State Court bars the recharacterization claim does not make

sense and why it was denying 60G's motion to dismiss the recharacterization claim on that basis

-- because the recharacterization claim is governed by federal law and thus was not and could not

have been litigated in the State Court:

> Here, as I stated, there are many grounds for the motion to dismiss.
> The first two that I will address are based on claim and issue preclusion
> or *res judicata* and collateral estoppel. Here, the Court applies New York
> law as to what constitutes both *res judicata* and collateral estoppel.
> (July 14, 2020 Hearing, 36:20-23.)

The Court first explained that res judicata is inapplicable to bar the recharacterization

claim based on termination of the Lease:

> Under the doctrine of res judicata, a final judgment on the merits of an action precludes the parties or privity from relitigating issues that were or could have been raised in that action. *Storey v. Cello Holdings, L.L.C.*, 347 F.3d 370, 380 (2d Cir. 3 2000). (Id., 36:20-37:4.)

> New York takes a transactional approach to *res judicata* under which claims that arise out of the same transaction and could have been brought in a proceeding ultimately leading to final judgment on the merits are barred. The doctrine thus bars not only claims that were actually litigated, but also claims that could have been litigated if they arose from the same transaction or transactions. *See O'Brien v. City of Syracuse*, 54 N.Y. 2d 353, 357 (1981) and *Marinelli Associates v. Helmsley-Noyes Co.*, 265 A.D. 2d 1, 5 (2000). (Id., 37:5-14.)

> Here, there is a final judgment and the parties are the same through themselves or those who were in privity with them. *<u>However, the issues before me, as I previously discussed, could not have been raised in the prior litigation, as they are governed by federal law.</u>* (emphasis added) Again, *see In re Lefrak*, 223 B.R. 434-19 435 with regard to the applicability of federal law. And Hotel Syracuse, Inc. v. City of Syracuse Industrial Development Agency, 155 B.R. 833-34, specifically, dealing with the *res judicata* point.(Id., 37:15-23.)[8]

The Court further noted as follows with respect to the inapplicability of res judicata:

> I should go back and also note that in dealing with *res judicata* I have concluded that while a defense to the civil court eviction action, that was ultimately affirmed by the Appellate Division, can include matters that would be outside of the civil court's jurisdiction as affirmative claims, if they're raised as a defense, and therefore could fit within the New York transactional analysis of *res judicata*, the cause of action here, like the cause of action in *Bossbrinck* that I discussed earlier, does not assert a defense to possession of the property. Rather, it asserts a declaration the Debtor is the owner of the property. Recognizing that an eviction has already occurred and leaving to another day the proper remedy for such a declaration. (Id., 39:15-40:12.)

> A remedy that the PCH court in both PCH-1 and PCH-2 3 properly recognized is an equitable one that I believe the civil court clearly lacks the jurisdiction or lacked the jurisdiction to grant. *See*, for example, *930 Fifth Ave. Corp. v. Shearman*, 17 Misc. 3d 1126, *affirmed*; 885 N.Y.S. 2d 712 (1st Dep't. 2009). And in that regard, again, the Debtor here is not looking to obtain, and will not be enabled to obtain possession of the property, which takes this matter

---

[8] What was decided - denial of Yellowstone relief - was not on the merits. (See Adv. Pro. Doc. No. 7-2)

out of this fact pattern and analysis for res judicata purposes. *Henry Modell and Co. v.* 11 *Ministers*, 58 N.Y. 2d 456 (1986). (Id., 40:3-12.)

Having rejected 60G's res judicata argument, the Court also went on to likewise explain

the inapplicability of collateral estoppel:

> New York's doctrine of collateral estoppel is equally unavailable here. That doctrine requires that the issues in both proceedings are identical. The relevant issues were actually litigated and decided in the prior proceeding where there was a full and fair opportunity for the litigation of such issues, and the issues were necessary to support a valid and final judgment on the merits. *Central Hudson Gas & Electric* 5 *Corp. v. Empresa Naviera Santa S.A.*, 56 F.3d 359, 368 (2d Cir. 6 1995). *See also*, *Broich v. Incorporated Village of South* 7 *Hampton*, 462 Fed. Appx. 3926 (2d Cir. 2012). (Id., 37:24-388.)

> Here, the movant alleges that the issues actually were litigated in the state court proceedings as to whether the lease was instead a financing transaction, i.e. should be recharacterized, because the Court determined that the Plaintiff was indeed the landlord under the lease. However, the issue that was actually litigated was whether the Plaintiff or another entity, not the Debtor, but a different entity either controlled by or related to the person controlling the landlord originally when the lease was entered into. I'm sorry, not even when the lease was entered into, but presently, was the one that should have standing to enforce the lease. That's a completely different issue and therefore, the recharacterization issue was not actually litigated. Indeed, as I've already held, it could not have been litigated since it's an issue in the Second Circuit determined by federal law, not state law, and the state court did not begin to address the applicability of federal law. So, the motion should be denied on that basis. (Id., 38:9-25).

The Court's thorough disposition of these issues on 60G's motion to dismiss the

Complaint is unequivocal and clearly and conclusively resolved them against 60G for purposes

of this proceeding.  Nonetheless, 60G was undeterred and recycled the same failed grounds as a

basis for its motion to dismiss the Amended Complaint.  Because the Court had already ruled

against 60G, the Court once again rejected the arguments and likewise denied 60G's motion to

dismiss the Amended Complaint on those grounds:

… I will note that this is not the first motion to dismiss in this adversary
proceeding. 60G filed a motion to dismiss last year, which was the subject
of a hearing on July 14, 2020 where I denied the motion in all respects,
except one, where I concluded that the complaint before me did not contain
enough factual allegations. It didn't simply track the elements of a
recharacterization claim to state a plausible cause of action for
recharacterization under **Twombly** 4 and **Iqbal**. Notwithstanding ruling
on all of the other grounds for the motion to dismiss, 60G has reasserted
all of those other grounds and its motion to dismiss and *I have a simple
answer which is for the same reasons that I ruled before, all of those grounds
are denied.* (emphasis added) Nothing has changed with regard to those
arguments, including my view that given the equitable nature of the relief
sought, as I noted, the law in the circuit permits the court in step two of the
litigation if I were to grant the declaratory relief that the complaint seeks, i.e.,
recharacterization, to determine what relief would flow from that as a practical
matter. (September 3, 2021 Transcript of Hearing on Motion to Dismiss
Amended Complaint, 3:22-4:15.)

Later in the September 3, 2021 Hearing, the Court further explained that 60G is bound by

the Court's prior ruling:

As I noted at the beginning of this hearing, most of the motion argues a
number of grounds for dismissal of the complaint that have not changed
from the grounds asserted in the first motion to dismiss the first complaint
filed in this adversary proceeding, which I previously ruled on in a bench
ruling back on July 14, 2020. The complaint has not changed in any material
way related to those grounds to grant the motion to dismiss, and accordingly,
my ruling from July 14, 2020 still stands. Whether you want to call it the law
of the case or simply the court determining that having read the same arguments
for a second time, and considered their responses to them a second time, and
also considered my own underlying rationale for concluding those arguments
were insufficient, I will do so again. (Id., 15:17-16:5.)

60G's outrageous insistence on continuing to recycle this twice previously-rejected

argument for now a third time would appear to flout this Court's prior rulings. At best for 60G,

this Court should merely reject it yet again and deny 60G's motion on that basis.

### B.    Rooker-Feldman

The second of 60G's two (2) recycled arguments for dismissal that have already been

rejected by this Court and cannot be re-litigated on this motion is that this Court lacks subject

matter jurisdiction of the recharacterization claim under the Rooker-Feldman doctrine. (60G's
Motion, Argument, Point IV.)  According to 60G, that entitles it to dismissal on this motion
because: "Through its recharacterization claim, Prince effectively seeks to appeal the final, non-
appealable Appellate Term Order to this Court. This Court, however, does not have subject
matter jurisdiction to do so under the *Rooker-Feldman* doctrine."  (Id., p.22)

    60G also made this same exact argument on its motion to dismiss the Complaint and it
was likewise rejected at that time: "And, Your Honor, with respect to my last two arguments,
Rooker-Feldman, and judicial estoppel, I'm just going to rely upon the papers for those points,
Your Honor."  (July 14, 2020 Transcript, 23:7-9 (quoting 60G's counsel, Mr. Eichel.  See also,
60G's Motion to Dismiss the Complaint.)   As it did in rejecting 60G's argument that the
recharacterization claim is barred by termination of the Lease, the Court rejected the applicability
of Rooker-Feldman in a likewise thorough disposition and denied 60G's motion to dismiss the
Complaint on that basis as well: "So, I will deny the motion to dismiss to the extent it seeks relief
on the basis that the Court lacks jurisdiction under the Rooker-Feldman doctrine."  (Id., 34:5-7.)

    In making that ruling, the Court first explained the Rooker-Feldman doctrine and its
limited applicability:

> First, [60G's motion to dismiss the Complaint] seeks to dismiss on the basis
> of the Court's lack of jurisdiction under the Rooker-Feldman doctrine…
>
> The Rooker-Feldman doctrine is a judge-made doctrine interpreting federal
> jurisdictional statutes and establishing the principle that the lower federal
> courts have no jurisdiction to review state court judgments. It arises from two
> cases as discussed further in *Exxon Mobile v. Saudi Basic Industries* 18 *Corp.*,
> 544 U.S. 280 (2005), which limited the applicability of the Rooker and Feldman
> cases that had been previously decided to those cases where the losing party
> commences a suit in federal court after losing in the state court, which has
> occurred here. And in the similar suit in federal court, the plaintiff must
> complain of injuries caused by a state court judgment. The plaintiff must

invite district court review and rejection of that judgment, and the state court judgment must, as I said before, have been rendered before the district court proceedings commenced. *See Hense v. Martin*, 417 Fed. Appx. 83, 83-84 (2d Cir. 2011) and the cases cited therein. It clearly applies in 4 bankruptcy cases. (Id*.*, 28:14-29:5.)

But as stated in the Exxon case, and subsequent determinations by the Second Circuit, it is cabined by the factors that I've just stated. As stated by the Second Circuit the frames on which, either directly or de facto, the subsequent federal court action is complaining, and effectively seeks relief from, must be inextricably intertwined with the determination in the state court. *Phifer v. City of New York*, 12 289 F.3d 49 (2d Cir. 2002). Here, the Debtor/Plaintiff seeks recharacterization of the April 11, 1980 transactions between it and the defendants or their predecessors that resulted in their entry into a transaction denominated a lease. The claim seeks to recharacterize that lease for purposes of Section 365 of the Bankruptcy Code and a determination that the lease transaction actually memorialized the transfer to the Debtor of an ownership interest in and to the underlying property. (Id., 29:6-29:20)

The Court then explained that Rooker-Feldman is inapplicable here and that it was

denying 60G's motion to dismiss the recharacterization claim on that basis, because the

recharacterization claim is governed by federal law and is not seeking to undo the determination

of the State Courts:

As far as Rooker-Feldman is concerned, the present action is not looking effectively to undo the determination of the state courts, which held that the Debtor defenses to enforcement of the lease as a lease did not lie, and therefore, issued a warrant of eviction, which was upheld on appeal. Instead, the present action before me seeks recharacterization of what was denominated as a lease to be decided by the Bankruptcy Court with a declaration that the Debtor is actually the owner of the underlying property. The courts in the Second Circuit have long held that such a determination, i.e. the determination that the Debtor is seeking now in its complaint, is an issue to be decided under federal law, not under state law. And in the one case that is on point, which has not been addressed by the movant, notwithstanding it hasn't been cited by the Debtor/Plaintiff in its objection to the motion to dismiss, the issue before me could not have been decided for purposes of *res judicata*, and the analysis essentially is extremely close, if not parallel, as far as *res judicata* and Rooker-Feldman are concerned on this point by the state court because of the federal nature of the present action. *See Hotel Syracuse Inc v. City of Syracuse Industrial Development Agency*, 155 B.R. 824, 16 833 (Bankr. N.D.N.Y. 1993). (Id., 29:21-30:17.)

The Second Circuit addressed that holding in the context of a *res judicata* opinion in *In re Elder Care LLP v. Dupuis*, *In re Elder Care LLC.*, 503 Fed. Appx. *(footnote 1)* (2d 20 Cir. Nov. 15, 2012). It noted there, distinguishing the facts before it, that in *Hotel Syracuse*, the court's jurisdiction 22 arose under 28 U.S.C. Section 1334(e), which grants the district courts, and through the general order of reference and 28 U.S.C. 24 Section 157(a) devolves to the Bankruptcy Court's exclusive jurisdiction over all property of the Debtor and the estate for purposes of determining issues as to the property of the estate. The issue before the Court in *Hotel Syracuse* was, again, whether denominated leasehold interest was in fact a real property ownership interest. (Id., 30:18-31:5.)

Courts in the Second Circuit have thereafter consistently held that the issue of recharacterization, when brought in a bankruptcy case, is to be decided as a matter of federal law, not applicable state law. *See* for example, *Schachter v. Lefrak*, *In re Lefrak* 22 B.R. 431, 434-35 (Bankr. S.D.N.Y. 1998). *See also*, *Barney's, Inc. v. Isetan Co.* (*In re Barney's, Inc.*), 206 B.R. 228, 332 (Bankr. S.D.N.Y. 1997), and the cases cited in both of those opinions. As well as *In re Mirant Corp.*, 2005 Bankr. LEXIS 2309 *20 (Bankr. N.D. Texas Nov. 14 22, 2005). (Id., 31:6-15)

The S.D.N.Y. bankruptcy cases that I cited go back to *In re PCH Associates*, the leading case in the Second Circuit on lease recharacterization at 804 F.2d. 193, 200 (2d Cir. 1986). In that case, the Second Circuit did not analyze New York law on lease or contract recharacterization, but instead applied a series of bankruptcy court decisions and its own analysis based on its determination of what constitutes the economic substance of the transaction. *See also*, *International Trade Administration v. Rensselaer Polytechnic Institute*, 926 F.2d 744 24 (2d Cir. 1991). Where again the Second Circuit applied a general analysis, apparently, solely based on its own view of federal law. (Id., 31:16-32:2)

I am guided by *stare decisis* here, as well as the apparent approach of the Second Circuit in the *PCH* and *Rensselaer* case. And consequently, I conclude that the Rooker-Feldman doctrine could not apply here because the issue before me is a matter of federal law that the state court could not have decided. Moreover, the application of federal law here is not effectively or implicitly seeking to undo the state court's determination. A careful reading of *Bossbrinck v. Accredited* 4 *Home Lenders, Inc.*, 773 F.3d 423, 427 (2d Cir. 2005), bolters this conclusion.  (Id., 32:22-33:6.)

In the *Bossbrinck* case, the Second Circuit applied the Rooker-Feldman doctrine to allegations of fraud, including under federal statutes. To the extent, and only to the extent that pursuant to those allegations the plaintiff was seeking to undo the mortgage foreclosure and transfer of the property to the mortgage lender. To the extent that the plaintiff was seeking other relief, namely damages for fraud, the court held that the Rooker-Feldman doctrine did not apply. So, again, to the extent that this complaint seeks relief other than re-obtaining possession of the

property, which now, because of the eviction, lies with the owner of the property, the Rooker-Feldman doctrine would not apply. (33:7-18.) "So, I will deny the motion to dismiss to the extent it seeks relief on the basis that the Court lacks jurisdiction under the Rooker-Feldman doctrine. (Id., 34:5-7.)[9]

Despite the above, and just as 60G unsuccessfully recycled its losing argument that termination of the Lease bars the recharacterization claim, 60G likewise recycled its rejected Rooker-Feldman argument on its motion to dismiss the Amended Complaint as well, and the Court likewise once again also rejected that argument. Try as it may to ignore the Court's prior rulings, 60G cannot escape them or avoid the conclusion that its motion for summary judgment should be denied because these issues have already been resolved against 60G.

> **Point III        60G's Motion For Summary Judgment**
> **On Its Affirmative Defenses That It Was**
> **A Bona Fide Purchaser Should Be Denied,**
> **Because There Is No Dispute That 60G**
> **Had Actual Knowledge Of The Recorded**
> **Lease And Assignment When It Purchased**
> **Prince's Space, Putting It On Inquiry Notice**
> **That The Lease Could Be Recharacterized**

Notwithstanding Prince's entitlement to have the Lease recharacterized, 60G asserts defenses alleging that 60G is still in the clear because it was a *bona fide* purchaser for value

---

[9]  Having determined that Rooker-Feldman does not apply to the recharacterization claim for relief other than re-obtaining possession, the Court noted that Prince's proper remedy for recharacterization would be determined in a later proceeding:

> The question of the proper remedy, other than possession is one to be decided, I believe, later, after the declaration if one is ever obtained that the transaction is really one involving the transfer of ownership, as opposed to a leasehold interest. That was the approach the Second Circuit took in *In re PCH Associates*, two, or the second PCH Associates 24 case, 949 F.2d 585 (2d Cir. 1991), in which, after the determination that the lease there was not a true lease, that the bankruptcy court determined what remedies would apply. And that second determination went all the way up the chain to the Second Circuit. (Id., 33:19-34:4.)

("BFP") in 60G's Acquisition of Prince's Space in 2015.  (See Fogel Decl., Ex. H, First, Second

and Third Affirmative Defenses.)  These defenses are fatally flawed because 60G cannot satisfy

the elements necessary to achieve BFP status.

BFP status "has two elements: paying value and taking in good faith with no notice of the

prior conveyance."  *Akasa Holdings, LLC v. 214 Lafayette House, LLC*, 177 A.D.3d 103, 104-05

(1st Dep't 2019) (quoting Dale A. Whitman, Ann M. Burkhart, R. Wilson Freyermuth & Troy A.

Rule, Property § 11.10 at 774 (4th ed. 2019) (emphasis added).)[10]  "Notice of the prior

conveyance" means actual or constructive knowledge (*see 436 Franklin Realty, LLC v. U.S. Bank

N.A.*, 188 A.D.3d 960, 961-62 (2d Dep't 2020)), and the lease at issue is considered a

"conveyance" as it is for a term greater than three years.  *See, e.g., Jarns Holdings v. Huang*,

2007 NYLJ LEXIS 1841, at *3 (Civ. Ct. N.Y. Co. July 23, 2007) ("The lease at issue is

considered a 'conveyance' under RPAPL 291, as it is for a term exceeding three years, and

pursuant to the statute must be recorded in order to be valid as against petitioner, provided

petitioner is a subsequent purchaser in good faith and for valuable consideration.).[11]

Accordingly, "[t]he status of a good faith purchaser for value cannot be maintained by a

purchaser with either notice or knowledge of a prior interest or equity in the property, or one with

---

[10] The cases use the words "good faith" with both elements, and not as an independent element.

[11] RPAPL § 290(3) provides:

> The term 'conveyance' includes every written instrument, by which any estate
> or interest in real property is created, transferred, mortgaged or assigned, or by
> which the title to any real property may be affected, including an instrument in
> execution of a power, although the power be one of revocation only, and an
> instrument postponing or subordinating a mortgage lien; except a will, a lease
> for a term not exceeding three years, an executory contract for the sale or
> purchase of lands, and an instrument containing a power to convey real
> property as the agent or attorney for the owner of such property.

knowledge of facts that would lead a reasonably prudent purchaser to make inquiries concerning such." *Gregg v. M & T Bank Corp*., 160 AD3d 936, 940 (2d Dept 2018).

Here, 60G cannot satisfy the "no notice" element because it is undisputed that, before 60G's Acquisition, 60G had actual knowledge of facts putting it on inquiry notice that the Lease could be recharacterized.  There is no dispute that the Lease and Assignment were recorded. (Zabari Decl., Ex. A; Ex. B)  At the very least, then, 60G had constructive notice that the Lease conferred rights significantly different from those arising from the ordinary landlord/tenant relationship, which defeats 60G's BFP claim. See Stracham v Bresnick, 76 A.D.3d 1009; 908 N.Y.S.2d 95; 2010 N.Y. App. Div. LEXIS 6767 (2010) ("a mortgagee is under a duty to make an inquiry where it is aware of facts 'that would lead a reasonable, prudent lender to make inquiries of the circumstances of the transaction at issue'") (citing LaSalle Bank Natl. Assn. v Ally, 39 AD3d 597, 600, 835 NYS2d 264); Rasch, N.Y. 8 A copy of the Lease, as recorded (ACRIS Doc. ID: FT_1770008625977) and the Assignment of Lease (ACRIS Doc. ID: FT_1760008625976) are annexed hereto as Exhibits 3 & 4, respectively. 16 LANDLORD AND TENANT, § 2:5 [4th ed.] (when there is an attornment, "the tenant will be deemed to hold from the new owner upon the same terms as he previously held from the landlord"). See also, Maiorano v Garson, 65 AD3d 1300, 1303, 886 NYS2d 190 (2009) ("'[w]here a purchaser has knowledge of any fact, sufficient to put him [or her] on inquiry as to the existence of some right or title in conflict with that he [or she] is about to purchase, he [or she] is presumed either to have made the inquiry, and ascertained the extent of such prior right, or to have been guilty of a degree of negligence equally fatal to his [or her] claim, to be considered as a bona fide purchaser") (quoting Williamson v Brown, 15 NY 354, 362 [1857]) (emphasis added)

Moreover, under New York law, a prospective bona fide purchaser is not only charged with constructive notice of all matters which are in the record (see In re Hardway Restaurant, Inc., 31 B.R. 322, 330 (Bankr. S.D.N.Y. 1983) (citing Doyle v. Lazarro, 33 A.D.2d 142, 306 N.Y.S.2d 268 (2nd Dep't 1970), aff'd, 33 N.Y.2d 981, 353 N.Y.S.2d 740, 309 N.E.2d 138 (1974)), but in instances "where a tenant is in open visible and continuous possession of real estate, such occupancy can be deemed to put a subsequent purchaser on 'constructive notice' … of any rights which the tenant may thereafter establish." City Bank of Bayonne v. Hocke, 168 A.D. 83, 153 N.Y.S. 731 (emphasis added); see also 1426 46 St., LLC v. Klein, 60 A.D.3d 740, 743, 876 N.Y.S.2d 425, 427–28 (2009) ("Actual possession of real estate is sufficient notice ... to all the world, of the existence of any right which the person in possession is able to establish") (citing Phelan v. Brady, 119 N.Y. 587, 591–592, 23 N.E. 1109; Ward v. Ward, 52 A.D.3d 919, 921, 859 N.Y.S.2d 774)) (emphasis added).

60G also had knowledge of additional facts putting it on inquiry notice, including its assumption of the Lease and responsibility for the State Court Litigation seeking to terminate the Lease under the Purchase and Sale Agreement for 60G's Acquisition.  (Fogel Decl., Ex. K, e.g., sections. 1.1, 3.2, 4.3, 71(i), 7.2(a), 7.2(c), 7.2(d), 7.3(a))  60G also assumed responsibility for the State Court Litigation in a promissory note it signed in favor of its lender (the "Lender"). (Fogel Decl., Ex. P, Schedule 2 Covenants, Section C.5)  Accordingly, as this Court (Judge Drain) recognized when it denied 60G's motion to dismiss the recharacterization claim in the Amended Complaint, even if the Lease and Assignment were not recorded, given "the relatively simple documentation" and "the sophistication of 60G," review of those documents "would have put 60G on further inquir[y] notice regarding the potential recharacterization of the lease." (Fogel Decl. Ex. F at p. 17:9-17.)

26

60G undeniably had knowledge of the facts putting it on inquiry notice that the Lease

could be recharacterized.  Thus, 60G clearly fails to satisfy the "no notice" element of BFP status

and made 60G's Acquisition at its own risk.  60G's knowledge renders it unable to maintain BFP

status, regardless of whether or not 60G recognized the risks posed by the facts at that time.

Thus, as the court held in In re Hotel Syracuse, Inc., "[a]t the heart of the instant adversary

proceeding is the issue of whether Code § 365(d)(4) applies to the Lease [and] the proper focus

in determining [this] is "whether the parties intended to impose obligations and confer rights

significantly different from those arising from the ordinary landlord/tenant relationship." (citing

International Trade Admin. v. Rensselaer Polytechnic Inst., 936 F.2d 744, 748 (2d Cir.1991); In

re PCH Associates, 804 F.2d at 200. 13 "In making this determination a court is not constrained

by the labels placed upon the transaction by the parties. Rather, the court must look to the

economic substance of the transaction to determine whether it is in fact a 'true' lease. Id. (citing

See Rensselaer Polytechnic Institute, 936 F.2d at 748; In re PCH Associates, 804 F.2d at 200); In

re Moreggia Sons, Inc., 852 F.2d 1179 (9th Cir. 1988).  See Point I, supra.

Moreover, given 60G's knowledge and "sophistication," it is more likely that it

recognized the risks and chose to proceed anyway.[12]  The representations 60G made to the

Department of Law of the State of New York (the "DOL") in connection with the Condo

Conversion that resulted in the DOL's issuance of a "No Action Letter" dated March 4, 2015

---

[12] That would also explain the heavily discounted purchase price paid for 60G's Acquisition and
the subsequent resolution of the Foreclosure Action with 60G's Lender.  (Zabari Decl., Ex. S; Ex.
T).  As noted in 60G's motion for summary judgment, according to 60G, as of July 2016, the fair
market value of the rent for Prince's Space was at least $205,495.33 per month, or
$2,465,943.96.  (Fogel Decl., Ex. Q par. 10), and a reasonable assumption can be made that a
market value purchase price for Prince's Space would be based on some multiple of that annual
income stream.  Yet the NYC Transfer Tax Report for 60G's Acquisition shows that 60G's
purchase price in May 2015 was only $778,179, less than 4 months' rent at market value.  (Fogel
Decl., Ex. O.)

include that it "has inspected the [Building] and the commercial space contained therein" and

that it "is a sophisticated real estate investor that understands the complexities of purchasing a

commercial condominium unit in the City, County and State of New York [and] has been

represented by experienced counsel and real estate professionals throughout its inquiry about the

Property and during our discussions prior to entering into a purchase agreement with the Owner."

See Affidavit of Bruce H. Wiener , Esq. sworn to on April 8, 2021 in opposition to 60G's motion

to dismiss Amended Complaint, Ex. F (the Broda Affidavit) ¶¶ 5-7. Moreover, the affidavit

submitted by the shareholders of 542 Holding states that: 60G, as the prospective purchaser of

the commercial unit, "ha[s] participated in the contemplated transaction and ha[s] been or will be

provided by the Owner … [all] [i]nformation known by Owner and Sponsor which may result in

extraordinary expenses for Shareholders and Purchaser or the Condominium including, but not

limited to, assessments, liabilities, dangerous or hazardous conditions, pending litigation, and

administrative proceedings and all available information related to the current tenant in the

Commercial Unit." (See Id., Ex. G (¶ 10(e))

Cases mistakenly relied on by 60G clearly support the conclusion that 60G cannot

maintain BFP status.  For example, while 60G cites *Andy Assoc., Inc. v Bankers Tr. Co.*, 49

N.Y.2d 13 (1979), that case actually holds that the holder of a recorded mortgage was not a BFP

and its interest was subject to an earlier interest derived from an unrecorded instrument because

the holder of the recorded mortgage had constructive notice of the earlier interest.  Likewise, in

*Fekishazy v. Thomson*, 204 A.D.2d 959, 960 (3d Dept 1994), the Court held that the purchaser of

property subject to a disclosed month-to-month tenancy was not subject to an undisclosed and

unrecorded long-term lease with the same tenant.  And in *Baron Assoc. v Latorre*, 74 A.D.3d

714, 716 (2d Dept 2010), wherein the plaintiff sought to void a recorded mortgage satisfaction as

against a subsequent purchaser based on forgery and fraud, the Court upheld a bona fide

purchaser defense precisely because, unlike 60G, the purchaser "was not on notice of any prior

interest in that property which would lead a reasonably prudent purchaser to make inquiry (see

Fischer v Sadov Realty Corp., 34 AD3d 630, 631 [2006]), and there was nothing on the face of

the satisfaction of mortgage which would have alerted [defendant] to the plaintiff's claims (*see*

*Andy Assoc. v Bankers Trust Co.*, 49 NY2d 13, 22 [1979])."  Other cases wrongly relied on by

60G have no bearing whatsoever on the issue here (see, e.g., *Stoneybrook Realty, L.L.C. v.*

*Cremktco Inc.*, 176 Misc.2d 589, 590 (App Term, 2d Dept 1998), where the issue was whether a

tenant under a written lease could enforce against its new landlord an alleged oral modification

or waiver of a contractual right agreed to by its former landlord). *Id.* at 590.

As 542 Holdings' successor in interest, 60G also fails to satisfy the "no notice" element

because it is on notice of and bound by 542 Holding's agreement with Prince's claim of

ownership in the 1996 Action.  (See Preliminary Statement, supra.)

The foregoing amply demonstrates that 60G cannot satisfy the "no notice" element of

BFP status because it undeniably purchased Prince's Space with knowledge of the facts,

including the Lease, and subject to the rights it conveys, putting it on inquiry notice that the

Lease could be recharacterized.  As a result, its BFP defenses fail as a matter of law on that basis.

60G also fails to satisfy the "for value" element of BFP status.  While a BFP is not

required to pay fair market consideration, it is nonetheless required to act in good faith.

Especially given its sophistication, 60G did not act in good faith because it knowingly acquired

Prince's Space for a purchase price that was heavily discounted below fair market value to reflect

the inherent risks of the transaction posed by the facts, then tried to circumvent the facts to

eliminate those risks and obtain a huge windfall at Prince's expense.

For all these reasons, 60G cannot maintain the status of a *bona fide* purchaser for value.

## CONCLUSION

For the foregoing reasons, both branches of 60G's motion for summary judgment should be denied in full.

Dated: New York, New York
April 10, 2024

**LOUIS FOGEL & ASSOCIATES**

s/ Louis Fogel

By: _____

Louis Fogel
LouisFogel@LouisFogellaw.com

5 Nottingham Road
Annandale, New Jersey  08801
(908) 730-7692


200 Water Street, Suite 1403
New York, New York 10038
(212) 944-1580

*Attorney for Plaintiff Prince Fashions, Inc.*
